DATRON, INC., a Delaware
corporation, Plaintiff,

v.

CRA HOLDINGS, INC., a Delaware
corporation, Defendant.

No. 1:97–CV–341.

United States District Court,
W.D. Michigan,
Southern Division.

Jan. 15, 1999.

738

Richard A. Gaffin, Miller, Canfield, Paddock & Stone, PLC, Grand Rapids, MI, for Datron, Inc., plaintiff.

Michael F. Kelly, Michael Xavier Hidalgo, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, Kenneth G. Schuler, Latham & Watkins, Chicago, IL, for CRA Holdings, Inc., defendant.

## OPINION

ROBERT HOLMES BELL, District Judge.

The Plaintiff, Datron, Inc. ("Datron"), commenced this action against the Defendant, CRA Holdings, Inc. ("CRA"), to recover damages for the alleged contamination of certain real property it purchased from CRA. Datron asserts CRA is liable for clean up costs pursuant to: (1) an indemnification provision contained in the sales agreement between the parties; and (2) § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Pending before this Court are:[1] (1) Datron's Motion for Summary Judgment regarding CRA's indemnity obligations under the Stock Purchase

---

1. Magistrate Judge Joseph G. Scoville's order limited Phase I discovery and dispositive mo-

Agreement (Dkt # 25, 44); and (2) CRA's Motion for Summary Judgment as to both issues (Dkt # 27, 41). Datron has filed a Motion to Strike Exhibit # 12 from CRA's Motion for Summary Judgment (Dkt # 46). This Court has reviewed the briefs submitted in support of and in opposition to the parties' motions and has had the benefit of oral arguments held on October 2, 1998. For the reasons that follow, CRA's motion for summary judgment as to both issues is granted.[2]

## I. Background

CRA is a Delaware corporation with its principal place of business in Kalamazoo, Michigan. It is the corporate successor of International Controls Corporation ("ICC").[3] ICC owned a majority interest in its two subsidiaries, All American Industries, Inc. ("AAI") and Datron Systems, Inc. ("DSI").

AAI and DSI, or their subsidiaries, own the five properties at issue in Datron's complaint.[4] AAI has two subsidiaries, Anchor Metals, Inc. ("Anchor Metals") and IMCO. Anchor Metals is the owner of two of the properties at issue: the Anniston property and the Hurst property. AAI's subsidiary, IMCO, owns the Intercontinental Manufacturing Co. ("the IMCO property"). DSI owns the EEMCO property. DSI's subsidiary, Tech Systems Inc., owns the Tech Systems property ("Tech Systems").[5]

## A. Stock Purchase Agreement

Datron is a Delaware corporation with its principal place of business in Windsor, Connecticut. In May 1988, Datron and ICC entered into a Stock Purchase Agreement (Agreement) whereby ICC sold all outstanding shares of AAI and DSI stock to Datron. The sale closed on May 20, 1988. As part of the stock purchase transaction, Datron acquired the five properties.

The Agreement is to be interpreted according to the substantive law of New York.[6] Under § 5.32 of the Agreement, ICC made certain representations and warranties with respect to the environmental conditions at the properties Datron purchased. The Agreement contained an indemnification provision,[7] whereby ICC agreed to hold Datron harmless at all times from and after the Closing Date against "[a]ny and all damages, losses, liabilities ... costs and expenses resulting from any misrepresentation, breach of warranty or nonfulfillment of any covenant or agreement on the part of [ICC] under [the] Agreement." § 12.1(a) of the Agreement. The Agreement further provided that the indemnification obligation survived for a period of five years after the Closing Date, until May 20, 1993. §§ 12.3(a), 14(d).[8] Section 14(d) of the

tions to: (1) the temporal extent of CRA's liability for indemnification under the Stock Purchase Agreement; and (2) CRA's potential liability as a parent corporation under CERCLA. Dkt # 11.

2. Accordingly, Datron's motion to strike CRA's exhibit # 12 in its motion for summary judgment is moot and the Court need not address it.

3. Through a series of transactions during 1994 to 1996, ICC was merged into CRA.

4. It is undisputed that ICC did not own any of the properties.

5. The five properties at issue are located in various parts of the country. The Anniston property is located in Anniston, Alabama and the Hurst property is located in Hurst, Texas.

Both facilities fabricated and galvanized steel utility poles. The IMCO property is located in Garland, Texas; the EEMCO facility is in Los Angeles, California; and the Tech Systems property is in Thomaston, Connecticut.

6. Section 21 of the Agreement provides: "This Agreement shall be governed and interpreted and enforced in accordance with the laws of the State of New York as applied to contracts and fully performed in such State."

7. Certain deductibles and thresholds with respect to the indemnification provision are contained in § 12.8 but are not relevant to the disposition of the parties' motions.

8. Section 12.3(a) provides that the CRA's indemnification obligation "shall remain in full force and effect: (a) to the extent that such

Agreement contained an exception to the five year indemnification period for "proceedings" that have been initiated within the five year period but not yet completed.[9]

Datron brings this action against CRA as corporate successor to ICC.[10] Datron alleges that CRA failed to disclose that each of the properties had certain environmental conditions for which clean up was required.[11] It seeks an award of all indemnifiable amounts and a declaratory judgment that CRA is obligated to indemnify Datron for all expenses with respect to indemnifiable items under the Agreement. CRA seeks a declaratory judgment that it has no duty to indemnify Datron for any costs incurred after May 20, 1993.

## II. DISCUSSION

### A. Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the opposing party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining a motion for summary judgment the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in its favor. *Morales v. American Honda Motor Co. Inc.*, 71 F.3d 531, 535 (6th Cir. 1995). Nevertheless, the mere existence of a scintilla of evidence in support of the opposing party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the opposing party. *Id. See generally, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–80 (6th Cir.1989).

### B. Plaintiff's Contractual Interpretation Claim

Both parties contend that the Agreement is unambiguous and can only be read

indemnities relate to the representations and warranties set forth in this Agreement, for the periods set forth in Section 14 thereof."

Section 14(d) provides in relevant part that "the representations and warranties of Seller ... with respect to environmental matters shall survive for a period of five years after the Closing Date...."

**9.** After oral argument, Datron submitted a motion for leave to file supplemental authority re: "proceeding" (Dkt #51) which the Court granted (Dkt #53). Datron thereafter filed "Supplemental Authority Re: Proceedings" (Dkt #54) and CRA in turn filed a response to Datron's motion to file supplemental authority (Dkt #55).

**10.** For convenience, references hereinafter will be to CRA as opposed to ICC except for Part V in which ICC's relationship with the facilities is examined.

**11.** According to Datron, these conditions include:

Anniston Property: Metal soils contamination.

Hurst Property: Chlorinated solvent soil and ground water contamination.

IMCO Property: Underground storage tank removal and soil remediation; soil contamination.

EEMCO Property: Superfund site; soil and groundwater contamination; asbestos.

Tech Systems property: Post Closure ground water monitoring and maintenance of hazardous waste lagoons; removal of underground storage tanks; Superfund site.

Datron's Mtn for SJ at 6; Exhibits Referenced in CRA Holdings' Motion for Summary Judgment, (Dkt #29) Exhibit #18, Letter from Datron to ICC dated 5/19/93.

to require summary judgment as to the temporal scope of CRA's indemnification obligation in their favor. Datron claims that the costs for which it seeks indemnification fall within the exception to the five year indemnification period in § 14(d) for "proceedings." Section 14(d) provides that the environmental liabilities of the Seller shall survive:

> until the relevant statutes of limitations with respect of such matters have run (and for such additional time, in the event that *any proceeding with respect to any such environmental matter has been initiated prior to the end of the relevant limitation period set forth in this subparagraph (d)*, the representations and warranties made by Seller herein with respect to such matter shall survive until the conclusion of such proceeding).

(emphasis added.) The term "proceeding" is not defined in the Agreement. Datron received EPA notices advising that it was a "Potentially Responsible Party" ("PRP")[12] for the contamination of certain sites; see footnote 11; and notified CRA pursuant to § 12.4 within the five year period.[13] Datron contends that these PRP letters are "proceedings" pursuant to § 14(d) and that accordingly CRA is liable on its environmental indemnification obligation for costs incurred through the conclusion of the EPA investigation.[14]

Datron argues that "proceeding" should be broadly construed because no qualifier or modifier such as legal or judicial was used and offers, as support for its interpretation, the WEBSTER'S THIRD NEW INTER-NATIONAL DICTIONARY 1807 (1986) definition of "proceeding" as "an action or a particular course of action."

Alternatively, Datron argues that the PRP letters constituted a "proceeding" because they were the commencement of an investigation and negotiations in which the EPA would seek to hold Datron liable for the remediation costs of the affected sites. In this regard, Datron argues that PRP letters have been construed as a "suit" by other courts and reasons that "if the term 'suit' can be interpreted to include EPA PRP letters, the term 'proceedings' should be even more capable of such an interpretation" because " 'suit' more strongly indicates a legal action than the term 'proceedings.' "[15] The singular authority Datron offers for this analogy is *Michigan Millers Mutual Ins. Co. v. Bronson Plating Co.*, 445 Mich. 558, 519 N.W.2d 864 (1994), in which the Michigan Supreme Court concluded that an EPA PRP letter constituted a "suit" for purposes of triggering an insurer's duty to defend.

### III. ANALYSIS

The resolution of Datron's claim is guided by the well established principles governing the construction of contracts. It is the Court's duty to ascertain from the language of the Agreement what the parties to the contract intended by the term "proceeding" when they entered into the Agreement. When construing and interpreting a contract, the intentions of the parties must control. That intention is revealed by the language the parties chose to use in the formation of the contract.

---

**12.** These PRP letters are not part of the record before the Court.

**13.** Section 12.4 of the Agreement provides:

*Notice to the Indemnitor.* Promptly after the assertion of any claim by a third party or occurrence of any event which may give rise to a claim for indemnification from an indemnitor (the "Indemnitor") under this Section, whether or not the amount involved would be included within the limitation of liability provided for in Section 12.8 hereof, an indemnified party (the "Indemnified Party") shall notify the Indemnitor in writing of such claim and, with respect to claims by third parties, advise the Indemnitor whether the Indemnified Party intends to contest same.

CRA does not contend that it did not receive the notice within the prescribed time frame.

**14.** Transcript of Plaintiff's Oral Argument at 44 (Dkt # 52); Plaintiff's Reply Br. in Support of Plaintiff's Mtn for SJ at 3–4 (Dkt # 34).

**15.** Plaintiff's Supplemental Authority Re: Proceedings at 3. (Dkt # 54)

*Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). "To determine the parties' intent, the contract must be read as a whole, and all its clauses must be considered together to determine if and to what extent one may modify, explain or limit another." *Allendale Mutual Ins. Co. v. Excess Ins. Co., Ltd.*, 970 F.Supp. 265, 269 (S.D.N.Y.1997). The language of the contract as well as the facts and surrounding circumstances must be considered in interpreting the contract. 41 AM.JUR.2d *Indemnity* § 12 (1995). The court should accord the words and phrases of the contract their plain meaning; *City of Hartford v. Chase*, 942 F.2d 130, 134–35 (2d Cir.1991); and "should not rewrite unambiguous agreements." *Niagara County Sewer Dist. No. 1 v. Town of Niagara*, 214 A.D.2d 978, 979, 626 N.Y.S.2d 630, 631 (4th Dep't 1995); *Zolotar v. New York Life Ins. Co.*, 172 A.D.2d 27, 30, 576 N.Y.S.2d 850, 852 (1st Dep't 1991).

 Datron's argument is unpersuasive because the principles informing the construction of an indemnification provision are different from those animating a duty to defend in an insurance contract. The authority upon which Datron relies analyzes the meaning of "suit" in the context of triggering an insurance company's duty to defend. Such reliance is misplaced because "the duty to defend is distinct and separable from any duty to indemnify;" *Avondale Industries, Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1203 (2d Cir. 1989), *reh'g denied*, 894 F.2d 498 (2d Cir. 1990), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269. "The duty to defend arises whenever the allegations in a complaint against the insured fall within the scope of risks undertaken by the insurer, regardless of how false or groundless those allegations might be." *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304,

310, 476 N.E.2d 272, 274, 486 N.Y.S.2d 873, 875 (1984). In determining whether the duty to defend is triggered, the claim is "liberally construed." *Insurance Co. of North America v. Chinoise Restaurant & Trading Corp.*, 85 A.D.2d 712, 713, 445 N.Y.S.2d 835, 837 (2d Dep't 1981).

 It is well settled that a duty to defend is construed more broadly than the duty to indemnify. *Continental Casualty Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 647, 609 N.E.2d 506, 509, 593 N.Y.S.2d 966, 969 (1993); *Technicon Electronics Corp. v. American Home Assurance Co.*, 141 A.D.2d 124, 533 N.Y.S.2d 91 (2d Dep't 1988), *aff'd on other grounds*, 74 N.Y.2d 66, 542 N.E.2d 1048, 544 N.Y.S.2d 531 (1989); *Seaboard Surety Co.*, 64 N.Y.2d at 310, 476 N.E.2d at 274, 486 N.Y.S.2d at 875.

> Words in a contract are to be construed to achieve the apparent purpose of the parties. Although the words might seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view.... This is particularly true with indemnity contracts. [A] contract assuming [an indemnity] obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed.... The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances.

(citations omitted; internal quotation marks omitted) *Hooper Associates, Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491, 548 N.E.2d 903, 905, 549 N.Y.S.2d 365, 367 (1989). Because of the different contexts. Datron's analogy to PRP letters as "suits" is unavailing.[16]

---

16. Even if the Court was persuaded to utilize the framework urged by Datron, it would not be dispositive. A split of authority in New York case law exists ass to whether the receipt of a PRP letter constitutes a "suit" triggering the insurance company's duty to defend. In *Technicon Electronics Corp.*, the New York Court of Appeals determined that the EPA letter merely informed Technicon of its potential liability under CERCLA and that the EPA was interested in discussing Technicon's voluntary participation in remedial measures. The court held that the requirement of a "suit was clear and unambiguous" and that the duty to defend extended only to

In ascertaining the meaning of "proceeding," the "tests to be applied ... are common speech ... and the reasonable expectation and purpose of the ordinary business [person]." *Ace Wire & Cable Co., Inc. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390, 398, 457 N.E.2d 761, 764, 469 N.Y.S.2d 655, 658 (1983); *see Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336, 341, 670 N.Y.S.2d 393, 396, 693 N.E.2d 740 (1998); *Michaels v. City of Buffalo*, 85 N.Y.2d 754, 757, 651 N.E.2d 1272, 1273, 628 N.Y.S.2d 253, 254 (1995). Were the Court to construe the term "proceeding" as encompassing the letters from the EPA, the Court would expand upon the definition. As noted by CRA, the ordinary meaning of "proceeding" is one of actions before judicial tribunals. BLACK'S LAW DICTIONARY 1204 (6th ed.1990) defines "proceeding" as "[i]n a general sense, the form and manner of conducting juridical business before a court or judicial officer." Datron makes much of the definition of "proceeding" by Webster's Third New International Dictionary as "a particular action or course of action." However, in common parlance and understanding, the term has a legal connotation and is customarily limited to the actions before judicial and quasi-juridical tribunals. Moreover, the definition of the term should be construed in the context of the principles of strict construction animating an indemnity agreement.

Datron next argues that the Agreement does not require that costs actually be *incurred* within the five year period to be indemnifiable. Specifically, Datron contends that the Agreement "ensures that liability remained with ICC provided that the matter arose or was discovered prior to the end of the five year period"[17] and relies on § 12.1 as authority.[18] Section 12.1 provides that ICC's indemnification covers:

(a) Any and all damages, losses, liabilities, taxes and deficiencies and penalties and interest thereon and costs and expenses resulting form any misrepresentation, breach of warranty or nonfulfillment of any covenant or agreement on the part of the Seller under this Agreement....

Datron contends that where, as here, the contract is one of indemnity against *liability*, so long as the breach of warranty occurred during the five year period, CRA remains obligated to indemnify even if the damages accrued beyond the five year period.[19] Datron offers *Hurlbut v. Christiano*, 63 A.D.2d 1116, 405 N.Y.S.2d 871 (4th

suits, not allegations, accusations or mere claims which have not been embodied in a suit. *Technicon Electronics Corp.*, 141 A.D.2d at 140, 533 N.Y.S.2d at 105. However, in *Avondale Indus., Inc.*, 887 F.2d at 1206, the Second Circuit, in applying New York law, concluded that the PRP letter constituted a "suit" triggering the insurance company's duty to defend because the letter commenced a formal proceeding against Avondale, advised it that a public authority had assumed an adversarial posture towards it and that disregard of the DEQ's demands might result in the loss of substantial rights by Avondale. The *Avondale* court distinguished *Technicon Electronics Corp.* on the basis that the letter in that case was an invitation to voluntary action and that "[a] request to participate voluntarily in remedial measures is not the same as the adversarial posture assumed in the coercive demand letter that Avondale received." *Id.* Compare *Borg–Warner Corp. v. Insurance Co. of N. America*, 174 A.D.2d 24, 35, 577 N.Y.S.2d 953, 960 (3rd Dep't), *appeal denied*, 80 N.Y.2d 753, 600 N.E.2d 632, 587 N.Y.S.2d 905 (1992) (PRP letters are not equivalent of suits because they seek only voluntary participation and negotiation and do not threaten litigation), *and Carpentier v. Hanover Ins. Co.*, 248 A.D.2d 579, 670 N.Y.S.2d 540, 541 (1998) (certain PRP letters do not constitute suits within the meaning of the policy because they "merely informed the plaintiffs of their potential liability and sought voluntary action on their part"), *with Colonial Tanning Corp. v. Home Indemnity Co.*, 780 F.Supp. 906, 916 (N.D.N.Y.1991) (government's position was sufficiently adversarial and coercive as to constitute a suit within the meaning of the policies at issue).

17. Plaintiff's Mtn for SJ at 9.

18. Plaintiff's Mtn for SJ at 9; Plaintiff's Reply Br. in Support of Plaintiff's Mtn for SJ at 4 (Dkt # 34).

19. Plaintiff's Mtn for SJ at 11.

Dep't 1978), as support for its position that, under New York law, the five year survival period should be construed as a notice period.

*Hurlbut* involved a Purchase Agreement that provided that in the event the plaintiffs claimed a breach of warranty, they were required to give written notice of such claim to the defendants specifying the amount claimed and the facts upon which the claim was based. The issue in *Hurlbut* was whether the contractual three year notice period truncated the statute of limitations within which the plaintiff could bring suit. *Id.* at 1117, 405 N.Y.S.2d at 872. *Hurlbut,* therefore, does not assist in the determination of whether costs must actually be incurred within the indemnity period in order to be indemnifiable.

Datron also offers *24 Leggett Street Ltd. Partnership v. Beacon Industries, Inc.,* 239 Conn. 284, 685 A.2d 305 (1996) as authority that liability does not have to be incurred to be indemnifiable. In that case, the relevant indemnity provision stated that "Seller shall defend, indemnify and hold Purchaser harmless from and against any liabilities, losses, damages, costs or expenses ... of any nature arising from the environmental condition of or problem with the Property...." *Id.* at 305, 685 A.2d at 316. The Connecticut Supreme Court concluded that "because the indemnity protects against *liability* in addition to *loss,* the plaintiff need not wait until *an actual loss occurs,* but may sue once liability is incurred." *Id.* (emphasis added). Datron argues that, in light of this, the five year period limits only the time frame during which a breach of an environmental representation or warranty must occur and does not limit liability to costs actually incurred during that period.[20]

Datron's interpretation is overly broad. Although the Court stated that the "plaintiff need not wait until an actual loss occurs, but may sue once liability is in-

curred," it did not determine that a breach of warranty within the indemnity period constituted liability for purposes of indemnification.

 CRA contends that its potential indemnification obligations are limited to: (1) a loss *paid by* Datron or (2) a liability *paid* or *judicially determined* in a final judgment, order or decree within the five year period and offers § 12.7 as support. Section 12.7 provides:

At the time that the Indemnified Party shall suffer a loss because of a breach of warranty, representation or covenant by the Indemnitor or at the time the amount of any liability on the part of the Indemnitor under this section is determined (which in the case of payments to third person shall be the earlier of (i) the date of such payments or (ii) the date that a court of competent jurisdiction shall enter a final judgment, order or decree ...) the Indemnitor shall forthwith, upon notice from the Indemnified Party, pay to the Indemnified Party the amount of the indemnity claim.

CRA alleges that its interpretation is consistent with traditional indemnity principles, whereby a provision to indemnify for losses creates no rights until payment is made to the party seeking indemnity and a duty to indemnify for liability is triggered only when a judgment is entered against the indemnitee.[21] Accordingly, CRA reasons that because the period of indemnity expired in 1993, costs incurred or liability determined after the expiration of that period fall outside the ambit of the Agreement.[22] The Court agrees.

 The interpretation of the Agreement is governed by the principles of indemnity. Contrary to Datron's argument that it need only sustain a breach of warranty within the five year period to

---

**20.** Plaintiff's Reply Br. in Support of Plaintiff's Mtn for SJ at 5.

**21.** Defendant's Mem. in Opp'n to Plaintiff's Mtn for SJ at 6.

**22.** *Id.* at 7.

extend CRA's indemnification obligation beyond this time frame, it is well established that the duty to indemnify is triggered when the liability is *fixed.* 41 Am. Jur § 44, Indemnity (1995) (emphasis added). "[U]nder New York law, no liability existed unless it was . . . fixed by a judgment or a fair settlement. *See Smith v. Hooker Chemicals & Plastics Corp.,* 89 A.D.2d 361, 455 N.Y.S.2d 446, 449–50 (App.Div.1982) (indemnification claim against liability does not accrue until the underlying claim is resolved), *appeal dismissed,* 58 N.Y.2d 824 (1983); *Hobbs v. Scorse,* 59 A.D.2d 1037, 399 N.Y.S.2d 783, 785 (1977) (claim for indemnity does not arise until the prime obligation has been established.)" (Internal quotation marks omitted.) *Hutton Const. Co., Inc. v. County of Rockland,* 52 F.3d 1191, 1193 (2d Cir.1995). *Accord McDermott v. City of New York,* 50 N.Y.2d 211, 216, 406 N.E.2d 460, 461, 428 N.Y.S.2d 643, 645 (1980) ("[i]ndemnification claims . . . do not accrue until the party seeking indemnification has made payment. . . ."); *Bay Ridge Air Rights Inc. v. State of New York,* 44 N.Y.2d 49, 53, 375 N.E.2d 29, 30, 404 N.Y.S.2d 73, 74 (1978) ("a cause of action for indemnity accrues on the date payment is made by the party seeking indemnity").

■■■ Datron asserts that the Agreement does not contain any language which requires that costs must be incurred to be indemnifiable. A consideration of the entire contract undermines Datron's argument. The exception to the five year indemnity period is carefully limited to matters which are the subject of a "proceeding" commenced but not yet completed within the five year time frame. See § 14(d). This provision extends CRA's indemnification obligation to a narrow scope of matters until their conclusion. Such an exception would be unnecessary and redundant if, as Datron asserts, it need only give notice of a breach of warranty to CRA within the five year period to obtain indemnification beyond this time frame. "[A] construction which makes a contract provision meaningless is contrary to basic principles of contract in-

terpretation." *Columbus Park Corp. v. Dept. of Housing Preservation and Development of City of New York,* 80 N.Y.2d 19, 30, 598 N.E.2d 702, 708, 586 N.Y.S.2d 554, 560 (1992). Under New York law, an interpretation of a contract that has:

> the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible. *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.

(Internal quotation marks omitted.) *Galli v. Metz,* 973 F.2d 145, 149 (2d Cir.1992). "Thus, when interpreting this contract [the Court] must the entire contract and choose the interpretation . . . which best accords with the sense of the remainder of the contract." *Id.*

■■■ The Court concludes that liability must have been incurred by Datron before May 20, 1993 for CRA to be liable for indemnification pursuant to the Agreement. Therefore, Datron's motion for summary judgment as to the indemnification agreement is denied and CRA's motion for summary judgment is granted.

## IV. Tech Systems Plant Closure Plan Agreement

ICC agreed to assume additional financial obligations with regard to the Tech Systems property. These obligations are set forth in 5.32(b) of the Agreement, which states:

> Notwithstanding anything in the foregoing to the contrary, the respective liabilities of Seller and Buyer in connection with the plant closure plan, heretofore delivered by Seller to Buyer concerning the plant of Tech Systems Corp., . . . ("The Plant Closure Plan") shall be as set forth in the Plant Closure Plan Agreement between Seller and Buyer, ("the Plant Closure Plan Agree-

ment") in the form annexed hereto as Exhibit A.

The Plant Closure Agreement incorporated the Plant Closure Plan, which was prepared by an outside engineering firm. Datron argues that it is entitled to summary judgment regarding certain post-closure costs with regard to the Tech Systems property pursuant to the Plant Closure Plan Agreement.[23] Paragraph 1 of the Plant Closure Plan Agreement provides that:

> 1. Buyer or Tech shall pay directly to the appropriate party or parties up to $100,000 for the cost of implementation of the Remedial Actions. To the extent that Buyer or Tech shall incur or pay more than $100,000 for such cost, regardless of whether such incurrence or payment is prior to or after the Closing, Seller shall reimburse and shall indemnify Buyer or Tech for the cost in excess of $100,000. This right to payment and reimbursement is absolute and is not subject to the limitation of liability under Section 12.8 of the agreement.

Datron asserts that "post-closure monitoring and the posting of financial assurance for post-closure monitoring" are encompassed with the definition of "remedial actions."

CRA contends that the Court should deny the plaintiff's motion for summary judgment because: (1) these issues are beyond the scope of the discovery order; see footnote 1; and because no discovery has been conducted regarding what costs Datron actually incurred; and (2) the copy of the Plant Closure Agreement that Datron attached to its motion had not been executed and that the proffered Plant Closure Plan was amended May 31, 1998, after the Stock Purchase Agreement was executed. In its Reply Brief in Support of

its Motion for Summary Judgment, Datron requested leave to substitute a copy of the executed Plant Closure Plan Agreement as Exhibit B and a copy of the entire Plant Closure Plan for Exhibit C. CRA opposes the substitution as untimely and argues that the proffered documents are not the ones the parties executed. CRA concedes, however, that the parties were aware of the Plant Closure Plan at the closing.[24]

Resolution of what, if any, costs fall within the ambit of the Plant Closure Plan Agreement is outside the case management order. Accordingly, the Court denies Datron's motion for summary judgment as to the interpretation of the Plant Closure Plan Agreement.

## V. CERCLA Liability

CRA argues it should be granted summary judgment as to Datron's CERCLA claims because: (1) it was not an "operator" of the facilities for purposes of CERCLA; and (2) Datron, as a PRP, cannot bring a § 107 action and is limited to bringing a contribution action under § 113.

Under CERCLA, any person who, at the time of disposal of any hazardous substance, owned or operated any facility is responsible for the costs of remediating such disposal. 42 U.S.C. § 9607(a)(2). The United States Supreme Court in *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), established the framework for determining whether a parent corporation is liable as an "operator" of a facility owned by its subsidiary. The Court determined that under CERCLA, an "operator" is

> someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for

---

**23.** Plaintiff's Mtn for SJ (Dkt # 25) at 12–15.

**24.** During oral argument, CRA stated that:
The plant closure plan was a RCRA closure plan that affected the facility. It was something that was known at closing [and] was something that the parties negotiated. And that negotiation says that to the extent [Da-

tron] incur[s] costs implementing the plant closure plan ... the seller pays that. That's ICC's responsibility and it's ICC's responsibility indefinitely. No dispute about what the contract says.
Transcript of Defendant's Oral Argument at 21.

purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Bestfoods,* 118 S.Ct. at 1887. "The question [for direct liability] is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." *Id.* To distinguish a parental officer's oversight of a subsidiary from control over the operation of the subsidiary's facility, a court is guided by norms of corporate behavior:

> [A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.... The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

(Citation omitted; internal quotation marks omitted.) *Id.* at 1889.

Datron argues that ICC was an operator of the Anniston, Hurst, IMCO and EEM-CO facilities [25] within the *Bestfoods* standard and offers the following as evidence:

(1) ICC's corporate policy referred to the subsidiaries as divisions;

(2) ICC's corporate safety director conducted semiannual OSHA inspections of the properties;

(3) ICC's corporate policy required all employees and divisions to comply with RCRA; [26]

(4) Jay Harris was the Executive Vice President and Chief Operating Officer of ICC as well as President of IMCO, DSI and AAI; and

(5) the subsidiaries had to obtain ICC's approval for any credit arrangements beyond the normal commercial credit accounts.

With respect to the Tech Systems property, Datron argues that "ICC actively directed environmental matters at the [property]" and offers, in addition, that:

(1) Frank McCafferty, ICC's Risk Manager, sought environmental liability coverage for Tech Systems;

(2) William Ragals, ICC's general counsel, sought outside counsel and was involved in the resolution of the EPA's complaint; and

(3) Ragals was involved in obtaining an easement for a pipe to carry drainage.

CRA responds that each subsidiary was operated as an independent business. Environmental compliance and hazardous waste decisions were made by personnel employed at that facility. With regard to Tech Systems, CRA maintains that Tech Systems employees were responsible for handling environmental matters on a day-to-day basis. In fact, the decisions regarding environmental compliance that ultimately resulted in the EPA filing a complaint against it were made by Tech Systems employees. Ragals' involvement in resolving the EPA action was at the specific request of the Tech Systems' president. Ragals obtained outside counsel and assisted in negotiating with the EPA to settle the matter. Ragals also contacted outside counsel regarding obtaining an easement. His involvement, however, was limited to discussions regarding the terms of the easement, which was to drain water from Tech Systems' roof. The pipe carried rainwater and bears no relationship to the creation or disposal of hazardous waste. CRA argues that Datron's evidence, individually or cumulatively, fails to demonstrate that

---

**25.** Datron addresses Tech Systems separately.

**26.** The Resource Conservation and Recovery Act of 1976, *as amended,* 42 U.S.C. § 6928(a)(1) (1994 & Supp.1997).

ICC "manage[d], direct[ed], or conduct[ed] operations ... having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods,* 118 S.Ct. at 1887. The Court agrees.

 ICC's involvement with the facilities falls soundly within the parameters of normal oversight by a parent corporation over its subsidiaries. Referring to the subsidiaries as divisions, obtaining insurance, establishing corporate policies and conducting sporadic safety inspections are the kind of activities "which are consistent with the parent's investor status." *Id.* at 1889. Harris' multiple roles are not evidence that ICC was an "operator" of the facilities. The Supreme Court clarified that it is not "enough to establish liability" that "dual officers and directors supervised activities at the facility." *Id.* at 1886. "[C]ourts generally presume that the directors are wearing their subsidiary hats and not their parent hats when acting for the sub." *Id.* at 1888. Datron's patchwork of examples fails to demonstrate ICC "operated" the facilities.[27] CRA's motion for summary judgment as to the CERCLA counts is granted.

An order consistent with this opinion will be entered.

### ORDER

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt # 25) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Request to Substitute Exhibits B and C, such request being contained in Plaintiff's Reply Brief in Support of its Motion for Summary Judgment (Dkt # 34) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Exhibit # 12

from the Defendant's Motion for Summary Judgment (Dkt # 46) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to Extend Time to File Response to Defendant's Motion for Summary Judgment (Dkt # 44) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Defendant's Motions for Summary Judgment (Dkt # 27, 41) are **GRANTED.**

---

**27.** Because the Court's decision that CRA is not an operator for purposes of imposing CERCLA liability is dispositive of the CERC-LA claims, it is unnecessary to reach CRA's argument that a "PRP" cannot maintain an action under § 107.