BESTFOODS, f/k/a CPC International, Inc., Plaintiff,

v.

AEROJET–GENERAL CORPORATION, et al., Defendants.

United States of America, Plaintiff,

v.

Cordova Chemical Company of Michigan, et al., Defendants,

and

Bestfoods, f/k/a CPC International, Inc., Defendant and Third–Party Plaintiff,

v.

Commercial Union Insurance Company, et al., Third–Party Defendants.

Nos. 1:89CV503, 1:89CV961.

United States District Court, W.D. Michigan, Southern Division.

Nov. 9, 2001.

J. Michael Smith, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for Bestfoods.

Jennifer M. Granholm, Atty. General, Transportation Div., Lansing, MI, Kath-

leen L. Cavanaugh, Lansing, MI, for Michigan Dept. of Environmental Quality.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILLMAN, Senior District Judge.

## I. INTRODUCTION

This consolidated action involves a series of claims brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (1988). The parties are litigating who must pay past and future costs incurred in the environmental cleanup of the soil, surface water and groundwater surrounding a dormant chemical manufacturing plant located near Muskegon, Michigan, that has become one of the nation's most severely contaminated areas. The case has a lengthy and tortured history.

The parties participating in the liability phase were the United States; CPC International, Inc. ("CPC")[1]; the Michigan Department of Natural Resources (now the Michigan Department of Environmental Quality or "MDEQ"); and Aerojet-General Corporation ("Aerojet"), along with its two wholly owned subsidiaries, Cordova Chemical Company and Cordova Chemical Company of Michigan (collectively, "the Cordova defendants").[2] The CERCLA liability phase of this case was tried before the court over 15 days in May and June 1991.[3] On August 21, 1991, this court

---

1. Before inception of this action, CPC was known as Corn Products International. Prior to the 1991 trial, it changed its name to CPC International, Inc. In 1998, CPC became known as "Bestfoods." For ease of reference and for consistency with other record information, this court will continue to refer to defendant Bestfoods as "CPC."

2. The parties announced on the morning of trial that claims had been settled against another party, Arnold Ott. The court entered a consent decree in accordance with CERCLA's settlement provisions, 42 U.S.C. § 9622 et seq.

3. By prior order of the court, this case was separated into three phases: liability, remedy and insurance coverage. See Order, Novem-

issued an opinion setting forth the court's findings of fact and conclusions of law regarding CERCLA liability. In its decision, the court concluded among other things that CPC, as the parent of Ott Chemical Company, was an "operator," within the meaning of CERCLA, of Ott's Muskegon manufacturing. *See CPC Int'l, Inc. v. Aerojet–General Corp.,* 777 F.Supp. 549 (W.D.Mich.1991).

This court's decision was appealed to the United States Court of Appeals for the Sixth Circuit. On July 14, 1995, a divided panel of that court substantially reversed the decision. *United States v. Cordova Chem. Co.,* 59 F.3d 584 (6th Cir.1995). Thereafter, the case was reheard *en banc,* and, on May 13, 1997, a divided *en banc* court again reversed this court. The United States Supreme Court granted certiorari. *United States v. CPC Int'l, Inc.,* 522 U.S. 1024, 118 S.Ct. 621, 139 L.Ed.2d 506 (1997). On June 8, 1998, in a decision not fully agreeing with the analysis of either the Sixth Circuit or this court, the Supreme Court vacated the Sixth Circuit decision and remanded to the Sixth Circuit with directions to remand to this court for new findings, in accordance with the standards for operator liability set forth in its opinion. *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).[4]

The matter is now before the court for findings, pursuant to the *Bestfoods* decision, regarding the liability of defendant CPC. Since issuance of that decision, the court has permitted the parties to supplement the record to address facts placed in

issue by that decision. *See Bestfoods,* 524 U.S. at 73 n. 14, 118 S.Ct. 1876 (suggesting that the government, on remand, should be permitted to point to additional evidence). After careful consideration of all the evidence and arguments, the court makes the following findings of fact and conclusions of law on the issues of CERCLA liability of remaining defendant CPC, in accordance with Fed.R.Civ.P. 52(a). Applying the *Bestfoods* decision and other relevant case law, the court is persuaded that CPC is not liable under CERCLA for the costs of remediation. Accordingly, judgment is rendered on behalf of CPC and against the United States and the MDEQ.

## I. FINDINGS OF FACT

In the 1991 trial of this matter, CPC, MDEQ and the Cordova defendants each defended theories of liability advanced by the United States or other defendants under CERCLA's liability provisions in section 107(a) of the statute. 42 U.S.C. § 9607(a). In that trial, the court heard live testimony from 29 witnesses, received all or part of dozens of depositions, and admitted more than 2,300 trial exhibits. After remand, the court accepted an additional 50 exhibits into evidence, received extensive briefing by the parties and heard oral argument.

The following findings reiterate many, but not all, of the findings made by this court in its 1981 decision. The court has eliminated certain findings with respect to the Cordova defendants, inasmuch as such findings are irrelevant to the present ques-

---

ber 14, 1990. The court denied nine dispositive motions filed with respect to liability. *See CPC Int'l, Inc. v. Aerojet–General Corp.,* 759 F.Supp. 1269 (W.D.Mich.1991).

4. After remand of the action to this court, the United States and the State of Michigan reached a settlement with defendants Aerojet, Cordova Chemical and Cordova Chemical of

Michigan. Following notice and lodging of the proposed consent decree and opportunity for hearing, on August 24, 2000, this court entered the consent decree constituting final judgment in this matter as to Aerojet, Cordova Chemical and Cordova Chemical of Michigan.

tions before the court. In addition, the court has made supplemental findings with respect to determinations relevant to the Supreme Court's decision on remand, particularly in connection with the role of G.R.D. Williams and the direct operation of the facility by CPC. Further, the court has modified certain other findings that previously rested in part on the relation-ship between CPC and Ott II as parent and subsidiary, a relationship rendered irrelevant to a determination of direct operator liability under *Bestfoods*.

## A. *Background*

### 1. Ownership

The site of contamination that is the subject of this litigation is a property known as 500 Agard Road in Dalton Township, Michigan, ("the site"), which is located near Muskegon in a primarily rural area in the western part of the state. Groundwater underneath the site flows through an aquifer in a southeasterly direction toward two waterways, Little Bear Creek and the Unnamed Tributary. 777 F.Supp. at 555.

From approximately 1959 to 1986, the site was used by a series of owners as a chemical manufacturing facility for the production of a variety of synthetic organic intermediate chemicals used for pharmaceutical, veterinary and agricultural purposes. *Id.*

From 1957 to 1965, the site was owned and operated by the Ott Chemical Company, a Michigan corporation ("Ott I"). *Id.*

From 1965 to 1972, the site was owned and operated by a wholly owned subsidiary of CPC International, Inc. ("CPC"), known as Ott Chemical Company ("Ott II"). *Id.*

In 1972, Ott II sold the site to Story Chemical Company ("Story"), a Georgia corporation. Story owned and operated

the site until it was adjudicated bankrupt in 1977. *Id.*

In 1977, the Michigan Department of Natural Resources ("MDNR") initiated a regulatory investigation at the site aimed at determining the extent of environmental problems and possible remedies. As part of its efforts, MDNR tried to attract a new purchaser for the site who would participate in a cleanup of the site. As a result of these efforts MDNR entered into negotiations with Aerojet–General Corporation and its subsidiary, Cordova Chemical Company. These negotiations were fruitful and on October 13, 1977, Cordova Chemical Company ("Cordova/California") signed a "stipulation and consent order" with MDNR that set forth obligations with respect to efforts to remedy environmental contamination problems at the site. One day later, Cordova/California, a wholly owned subsidiary of Aerojet–General Corporation ("Aerojet"), purchased the site from the Story bankruptcy trustee. *Id.*

In 1978, Cordova Chemical Co. of Michigan ("Cordova/Michigan"), a wholly owned subsidiary of Cordova/California, became the owner of the site. The facility has not been in operation since 1986. *Id.*

### 2. Contamination

Prior to the commencement of chemical manufacturing at the site in 1957, the quality of the groundwater underneath the site was excellent. *Id.*

By 1959, as a result of chemical waste disposal, the water pumped for use in the manufacturing process at the site had become contaminated. By 1964, test results showed that the groundwater flowing underneath the site had become contaminated. *Id.*

As a result of chemical manufacturing and waste disposal practices at the chemical facility, the soil, surface water and

groundwater at the site contain a large number of toxic chemicals. *Id.* at 555–56.

The principal source of contamination at the site was the use of engineered, unlined lagoons at the northwestern edge of the site for chemical waste disposal. From 1959 to at least 1968, during the Ott I and Ott II periods of ownership, wastewaters and other chemical waste used in the manufacturing process were discharged into the lagoons, where much of the contaminants seeped into the ground and water. No disposal into the lagoons occurred during the Story and Cordova periods. *Id.* at 556.

During the Ott I and Ott II era, chemical waste also entered the ground through the burial and slitting of hundreds of drums in a sandy pit; numerous spills of hundreds of gallons of chemicals from train cars onto railroad tracks; frequent overflows of chemical waste at a cement-lined equalization basin; and the dumping into the woods of buckets of hazardous chemicals that had spilled during the manufacturing process. Some spills of hazardous waste also occurred during the Story and Cordova periods of ownership. *Id.*

Contamination entering the ground from disposal in the lagoons or through spills then seeped into the ground and migrated away from the site via the aquifer to the southeast, ultimately reaching two waterways, Little Bear Creek and the Unnamed Tributary. *Id.*

Beginning in 1965 during the Ott I period of ownership and continuing during the Ott II period, purge wells were used intermittently at the site in an attempt to treat the groundwater contamination and retard the spread of contamination away from the site. *Id.*

### 3. EPA's response

In 1981, the federal Environmental Protection Agency (EPA) began investigating how to remedy severe contamination problems in the ground and water at the site and surrounding area resulting from hazardous waste disposal practices at the site. *Id.*

In 1982, the EPA placed the site and surrounding area on the federal government's National Priorities List of locations in need of a long-term remedial response. At the time of the 1991 trial in this matter, the site was ranked 137th among this country's environmentally hazardous sites most in need of federal remedial action. *Id.*

The EPA is presently continuing development and implementation of a three-phase, multi-million dollar remedial plan for the soil, surface water and groundwater at and surrounding the site. *Id.*

This litigation consists of a series of consolidated claims regarding who should be liable for cleanup costs under CERCLA, 42 U.S.C. §§ 9607, 9613 et seq. *Id.*

### 4. Stipulations

The parties have stipulated that the site is a "facility"; that the site contains "hazardous substances"; that "releases" have occurred and threaten to continue, as defined under CERCLA's relevant provisions; and that CPC, and MDEQ are "persons," as defined under CERCLA's relevant provisions, 42 U.S.C. § 9601. *Id.*

### B. *Ownership by Ott I: 1957 to 1965*

From 1957 to 1965, Ott I, a publicly traded Michigan corporation, owned and operated the site as a chemical manufacturing plant. *Id.* at 557.

The company was steered by an active board of directors that was significantly involved in the management of the company. Ott I's board of directors made company decisions regarding policies, goals

and directions in regular meetings which were commemorated in detailed minutes. During these meetings, the board conducted working sessions in which company officers presented comprehensive reports on the performance and activities of the various divisions. *Id.*

Arnold Ott was the leading officer and director of Ott I. From the inception of Ott I in 1956 through its sale in 1965 to CPC, he served as president and chief executive officer of Ott I, and at various times served in other positions, including treasurer. He also served on the company's board of directors, which he chaired for a period of time. In addition, he was the company's largest shareholder, owning nearly 30 percent of its stock in July 1965, a time when the next largest shareholder owned only about 5 percent. *Id.*

Another leading Ott I official was James Eiszner, a vice-president of marketing. *Id.*

In 1963, Alexander McFarlane, CPC's chairman of the board, joined the Ott I board. He soon became impressed by members of Ott I's management group, whom he admired for their dynamic, entrepreneurial spirit. McFarlane became interested in the possibility of tapping the scientific talent he had encountered to help CPC expand its primary business areas of corn wet-milling and consumer food products. *Id.*

In the spring of 1965, McFarlane and Arnold Ott began to discuss the possibility of CPC acquiring Ott I. McFarlane was interested in bringing Ott I officials, particularly Ott and Eiszner, into the CPC management structure. *Id.*

As a result of the discussions, McFarlane stepped down from the board of Ott I, and negotiations between top officials of Ott I and CPC followed in April and May 1965. *Id.*

### C. Ownership by Ott II: 1965 to 1972

1. Acquisition of Ott I

In June 1965, the Ott I board approved in principle an agreement and plan of reorganization for the purchase of the company by CPC. *Id.*

The same month, Arnold Ott moved to New York and assumed responsibilities within CPC management. Ott initially worked with Harold Hellman, CPC's assistant to the chairman. Ott also continued to function as president, chief executive officer, and director of Ott I. Ott's move took place three months before the formal purchase of Ott I. *Id.*

On July 19, 1965, the Agreement and Plan of Reorganization between Ott I and CPC was signed. (TX 132.)

On September 29, 1965, Ott I and CPC agreed to amend their July 19, 1965 agreement. providing certain changes in the liabilities of the seller and purchaser corporations. The amendment further assigned all benefits and liabilities that accrued to CPC under the original agreement to a wholly owned subsidiary of CPC, which would be formed by CPC prior to closing on September 29, 1965. The amendment further provided that CPC "shall have no liability whatsoever with respect to any of said obligations and undertakings." (TX 133.)

In September 1965, in preparation for closing on the sale, CPC created the Four Lakes Chemical Company, a wholly owned subsidiary incorporated in Delaware and capitalized with $1,000, for purposes of acquiring Ott I. The initial directors of Four Lakes were Arnold Ott and three CPC employees. *Id.*

On September 22, 1965, the Four Lakes board of directors elected as its officers five people, including Ott and Eiszner, who had held identical positions with Ott I. The

board also voted to change its name, effective October 1, 1965, from Four Lakes to the Ott Chemical Company ("Ott II"). *Id.*

Then on September 29, 1965, Ott I's assets and certain liabilities were sold to CPC's subsidiary Four Lakes, in exchange for 75,300 shares of CPC common stock. *Id.*

Under the agreement, Four Lakes agreed to assume certain specific liabilities of Ott I, with Ott I continuing to be responsible for those not designated. Ott I expressly remained liable for "injury or damages to persons or property arising out of the sale of any goods, the provision of any services, or the conduct of" Ott I prior to closing. In addition, the agreement set forth that Ott I "expressly represents that it will pay, or make provision for the payment of, all liabilities and obligations of, or claims against Seller [Ott I] not expressly assumed" by CPC or Four Lakes. *Id.*

The acquisition by CPC was publicized to customers, creditors, suppliers and the public. *Id.* at 558.

After the sale, Ott I maintained public liability insurance for three years, but it ceased to operate as a functioning corporation. The company's name was changed to Muskegon Chemical Company. *Id.*

On October 1, 1965, two days after the formal sale of Ott I, Four Lakes officially became the Ott Chemical Company ("Ott II"). *Id.*

Following the acquisition, Ott II functioned in a number of ways as Ott I had prior to the sale. The officers of Ott II remained identical to the officers of Ott I until March 1966. Ott II continued to use the name, "Ott Chemical Company." Ott II continued to manufacture substantially the same products. Ott II continued to sell products to nearly all of Ott I's customers. Ott II continued to employ most of the same personnel as Ott I, and Ott II continued the same chemical manufacturing operation at the same facility. *Id.*

CPC anticipated rapid growth for Ott II. Prior to the sale, Arnold Ott reported to the Ott I board that McFarlane and CPC President Howard C. Harder "envisage the chemical operation to reach at least $100,000,000 in five years." Following the acquisition, Ott II's production capacity significantly increased as CPC contributed millions of dollars to expansion efforts. This increase in production, in turn, created substantially greater amounts of wastewater and chemical waste in need of disposal in the unlined lagoons, which were expanded to accommodate the additional waste. *Id.*

### 2. Board of directors

Following CPC's acquisition of Ott II, the Ott II board of directors included CPC officers, who at times formed the majority of the board and who actively participated in the policy-making decisions of Ott II. *Id.*

The Ott II board of directors was an active board during CPC's period of ownership, continuing the tradition established in the Ott I era of functioning in an engaged, participatory manner. The board established policies and goals for the company. It also regularly received reports and presentations from Ott II officers, including accounts of mounting problems with waste disposal. These sessions sometimes lasted three to five hours. Far more than a rubber stamp for management, the Ott II board functioned as a major source of power and decision-making at the company. *Id.*

CPC had majority control of the board for nearly three years. In the first six months following the acquisition, all four directors on the then four-member board were CPC officials, including Ott. Then,

from March 1970 until the sale of the company to Story in June 1972, six of the eleven board members of Ott II were individuals with CPC positions. No fewer than three CPC-affiliated directors served on the Ott II board at all times, and CPC, as 100 percent shareholder, controlled the selection of board members. *Id.*

CPC directors serving on the Ott board reported back to CPC about Ott programs and gave approval on behalf of CPC for appropriation requests. *Id.*

During CPC's entire period of ownership of Ott II, the chairman of the Ott II board was always a top-ranking CPC executive. The president of CPC had the authority to determine who served as Ott II's chairman. Arnold Ott served as chairman from 1966 to 1969 at the same time that he was a CPC vice-president and the president of CPC's development company. From 1969–1970, Eiszner was the Ott II chairman in addition to serving as a CPC vice-president. Finally, Beverly Warner served as chairman from 1970 to 1972 while also serving as president of CPC's development company. *Id.*

Other CPC officials served as influential members of the Ott II board. Within six months of the acquisition, CPC placed Harold Hellman, a CPC vice-president and assistant to CPC's president, on the board. James W. McKee, CPC's financial officer, served on the board from 1968 to 1969. *Id.*

When the Ott II board expanded from eight to eleven members in 1970, the three additional directors were senior CPC employees, including Warner who was elected chairman and chief executive officer. *Id.* at 558–59.

CPC executives who were not Ott II board members also occasionally attended Ott II board meetings, including CPC's president and its chairman of the board. *Id.*

On some occasions, CPC matters were discussed at board meetings, and Ott II board members at times considered CPC's interests and sought guidance from the parent company during these sessions. *Id.*

The site of the Ott II board meetings regularly alternated between Ott II's headquarters in Muskegon and CPC's headquarters in New York and later Englewood Cliffs, New Jersey. *Id.* at 559.

Between 1965 and 1972, the Ott II board of directors met approximately every other month, with board meetings often lasting all day. At its meetings, the Ott II board would receive and act on reports from Ott II officers and operating managers. During its meetings, the Ott II Board reviewed the company's financial and operating performance, set the company's long term goals and policies, and discussed business strategies. *Id.*

### 3. Management

CPC was represented in the highest levels of Ott II management. *Id.*

Ott II corporate officers, however, set the day-to-day operating policies for the company without any need to obtain formal approval from CPC. High-ranking CPC officers served in Ott II management positions. In addition, the president of Ott II reported directly to CPC's president.

The Ott II management formulated and implemented the company's day-to-day operating policies, including sales, marketing, advertising, the purchase of raw materials, research and development, hiring and personnel policies, capital expenditures, manufacturing, and environmental matters. *Id.*

Several individuals served simultaneously as top-ranking Ott II and CPC officials. In some instances, the officials with dual

roles at Ott II and CPC worked out of CPC's headquarters in New York. *Id.*

Arnold Ott was one of the principal CPC officials who had an important role within Ott II management. Following his move to CPC headquarters to assume new corporate responsibilities at CPC even prior to the formal acquisition of Ott I, Ott served as president and chief executive officer of Ott II through December 1966. During this period, Ott worked from CPC's headquarters where he served concurrently as a CPC vice-president responsible for scientific research. In 1968, Ott became the first president of CPC's development company, a division with oversight responsibility for Ott II and other wholly owned subsidiaries involved in scientific development. During his tenure as president of CPC's development company, Ott also served as Ott II's chief executive officer. *Id.*

James Eiszner similarly held a major position at CPC at the same time that he was an active and influential member of Ott II's management. Eiszner served as Ott II's president from 1967 to 1970, and in 1968, he became a vice president of CPC's development company, reporting directly to its president, Arnold Ott. Eiszner subsequently ascended through the ranks of CPC, where he eventually became chief executive officer. *Id.*

In another instance, a high-ranking CPC official became an Ott II senior officer. Beverly Warner, who became president of the development company in 1969, assumed the position of Ott II's chief executive officer in 1970, a position he retained until the sale of Ott II to Story in 1972. *Id.*

While serving as CPC's development company president and Ott II's chief executive officer, Beverly Warner controlled decisions including production, pricing and plant operations at Ott II and actually undermined a number of Ott II programs. According to Eiszner, who eventually became CPC's chief executive officer, Warner "made some terrible, terrible management decisions which were probably what led" to the sale of Ott II in 1972. *Id.* at 559–60.

Eiszner himself was the subject of criticism for improperly giving too much attention to CPC matters while serving in dual management roles at Ott II and CPC. At an Ott II board meeting, board members admonished Eiszner for improperly allocating too much management time to CPC. *Id.*

The Ott II company airplane also was frequently unavailable for use by Ott II executives because dual Ott II/CPC officials were occupying it for travel between their headquarters and the subsidiary. *Id.*

Arnold Ott's control over Ott II matters continued even after he relinquished the Ott II presidency and served as CPC's development company president and Ott II chairman. For example, Ott singlehandedly made the decision to move Gerald Roberts, Ott II's controller and treasurer since 1967, to a similar position with the CPC's development company in 1968. Ott also personally recommended Roberts' successor at Ott II, David Hackney. *Id.*

4. CPC's Development Company

In 1967 or 1968, Ott II became associated with the Development Company. (TX 444 at 12–13.) The Development Company was a federation of several wholly owned CPC subsidiaries (plus the Moffett Technical Center) whose businesses spanned various technical disciplines. (TT at 560–61, 1404–05, 1410–11.)

The Development Company functioned as the custodian of CPC's investments in the member operating companies. It reviewed and analyzed the operating compa-

nies' financial performance and, at the subsidiaries' request, provided financial analysis or business planning advice. (TT 876–77, 1405–08, 1417–23.)

The Development Company board was advisory, and functioned as a means for the subsidiaries to communicate with the parent and with each other. The Development Company did not instruct Ott II how to go about its day-to-day business. (TT 1405.)

CPC's development company developed policy affecting Ott II in efforts to enhance performance, shape decisions and affect personnel changes. 777 F.Supp. at 560.

The Development Company, which had oversight responsibility for a number of CPC subsidiaries with scientific or technical specialties, served as another source of general policy and oversight of Ott II. Prior to the closing of the sale of Ott II to Story in 1972, Ott II president William T. White described to Story Chemical official Harry Forman: "Ott has been operating as part of the CPC Development Company, and, in addition, Ott has had its own Board of Directors. Thus ... overall policy has come from two sources...." *Id.*

Arnold Ott and Beverly Warner served successively as president of the Development Company during the Ott II era, and each held positions as chief executive officer and chairman of Ott II during their respective tenures with the Development Company. James Eiszner served as vice-president of the Development Company. *Id.*

The Development Company regularly reviewed Ott II and recommended changes on matters ranging from finances to personnel, making suggestions designed to generate more profits and enhance performance. The company sought to ensure that Ott II met profit plans and policy goals. It also decided, among other things, who would represent CPC on Ott II's board of directors. *Id.*

Ott II submitted monthly financial reports to the Development Company and an annual financial prospectus known as the "green book" for review and approval. Top Ott II officers provided reports to Development Company officials as well as the Ott II board. *Id.*

In addition, the Development Company conducted reviews of the subsidiary's performance that would be followed by suggestions for change within the subsidiary. For example, in December 1970, Arnold Ott and James Eiszner, who no longer held management posts with Ott II but were members of the Ott II board, visited the subsidiary at Warner's request. In a December 21, 1970, memo to Warner summarizing the visit, Ott wrote, "No intent was made to be demeaning or critical, but rather to evoke constructive discussion on policy interpretation, goal definition, organization for achieving and means for directing and controlling the profit-generating process." The memo also stated that Ott and Eiszner had "admonished" the Ott II officers "to be more incisive and decisive, more frugal on authorizations of expenditures and to let all the personnel know—now—that the Company is off course and the team must win." After another review of Ott II, Arnold Ott took the unusual step of reporting the results to Warner in the form of a telegram sent to his home. It read, in part: "Am absolutely convinced that total financial capability [at Ott II] is grossly lacking. Sound fiscal management impossible. At present don't see plan to make profitable operations for first quarter of '71. Suggest replacing Hackney immediately as one element of remedy." David Hackney was subsequently replaced. *Id.* at 561.

Other CPC officials engaged in similar missions to Ott II in which Ott II officials

received suggestions on how to improve and change. Development Company Vice-President Kenneth W. Knief visited Ott II to discuss with Ott officials the accuracy of the subsidiary's profit plans shortly before CPC's sale of Ott II to Story. In a March 27, 1972, memo, following the visit, Knief wrote to Warner that Ott II management "had been advised not to implement any changes in activity without discussion with Englewood Cliffs," CPC's headquarters. *Id.* at 561.

### 5. Environmental matters

In 1966, G.R.D. ("Rick") Williams was the Director of Government Affairs for CPC. Williams was a lawyer by training and had no technical training in environmental matters. (TT 1302.)

From 1966 to 1969, Williams served as CPC's Director of Air and Water Programs. (TX 2462.)

In 1969, Williams was made an assistant to A.S. Yohalem, a CP senior vice president, and continued to consult on and coordinate Corn Products' air and water issues through E.F. Schroeder, a Corn Products executive vice president. (TX 552.)

Between 1975 and 1976, Williams served as CPC's Director of Environment/Energy. (TX 948.)

G.R.D. Williams worked only for CPC; he was not an employee, officer, or director of Ott II. *Bestfoods*, 524 U.S. at 72, 118 S.Ct. 1876.

From approximately 1962 through approximately 1973, CPC did not have an environmental "department," but did have one or two individuals who worked on such issues. (Lundy dep. at 37–38; Garber dep. at 46–47.)

Rick Williams is the only person within CPC that CPC officials recall working on environmental issues. (TX 349 at 3.)

Williams was Corn Products' specialist in waste disposal and coordinated information on pollution control activities for CPC and its divisions and subsidiaries. (TX 349, TX 397.)

Williams also was CPC's acknowledged source for information on environmental legislation. (McKee TT at 1287; Hellman TT at 1302.)

In early 1966, the Muskegon facility was under pressure from Michigan regulators to solve the facility's waste disposal problems. (TX 218.)

Between September 1965 and August 1966, the record reflects no involvement by Williams in ongoing pollution control planning and compliance at Ott II.

At the Ott II board meeting of September 1966, in anticipation of an upcoming meeting with the state Water Resources Commission ("MWRC"), Robert Gottlieb, Ott II's Vice President of Manufacturing, outlined the options for waste disposal at Ott II. The board did not adopt a particular option at the September meeting, but it adopted a resolution approving the actions of Ott II management and consulting engineers thus far and instructing management to bring the final plan to the board for action. (TX 323 at 23.) Ott II board member and CPC executive Harold Hellman, suggested that Ott II executives contact Williams because he handled all CPC pollution problems and had dealt with similar waste disposal issues at another CPC subsidiary. *Id.*

Williams' first involvement with Ott II was at the September 21, 1966 meeting with the MWRC, which he attended along with representatives of Ott II. (TX 323 at 22.)

According to an October 6, 1966 letter from Williams to Winston Miller, an Ott II director, and copied to Robert Gottlieb, Williams advocated delaying implementa-

tion of the waste disposal proposal developed by consultants retained by Ott II. Williams did not feel that Ott II should mention the option because he did not think it would be needed as a waste disposal alternative. (TX 333, 334.) According to a memo sent by Ott II President Eiszner to John R. Yost, the new Ott II Vice–President for Manufacturing in 1967, this position was consistent with Williams' usual view "that delaying tactics are almost always advisable." (TX 397.) In that same memo, Yost also noted that Williams had failed to appreciate the impact of Ott II's waste disposal on Ott II's water supply, a circumstance that prompted Ott II to act quickly to remedy the problem, contrary to any recommendations by Williams. *Id.*

On October 19, 1966, Gottlieb responded to Williams stating, "I don't believe that the timing which you set forth is in the spirit in which we said it to the Commission. . . . Our own feeling is that we should proceed as rapidly as possible within the requirements of good engineering judgement [sic] and waste investigation and not delay our solution beyond the time that is absolutely necessary." (TX 336.) Williams did not attend the next meeting with the Water Resources Commission, which was held on November 10, 1966, nor did he attend any subsequent MWRC meeting.

Notwithstanding advice from Williams, on November 2, 1966, Ott II's retained engineer, Roy Weston, transmitted his report to the MWRC. (TX 341.) At the November 10, 1966 meeting, the waste disposal plan was presented to the MWRC. (TX 350.) Thereafter, at the November 18, 1996 board meeting, the Ott II board approved an appropriation request of $375,000 for the waste disposal facilities under the plan presented. (TX 351, 355.)

In March 1967, Ott II completed a CPC survey of air and water emissions at the Muskegon facility. (TX 363, 2322.)

Also in March 1967, Eizner of Ott II sent to Williams a proposed air pollution ordinance being considered by Muskegon County, and Williams later responded with his thoughts about the ordinance. (TX 397, 401.)

Only two other pieces of correspondence with Williams occurred in 1967. In May 1967, Eizner wrote to Williams with comments on a report that had been prepared by Williams which apparently discussed the water pollution problems at Ott II. (TX 408.) In July 1967, Williams wrote a short note to Ron Nugent at Ott II, thanking him for slides that had been used by Williams in a presentation on pollution problems at Ott II. (TX 424.)

During 1967, Ott II submitted to the MWRC plans for construction of an equalization basin, and the MWRC approved those plans. (TX 422.) Ott II also explored deep well injection disposal. (TX 2445, 2446, 2447, 429.) Ott II continued to struggle with onsite accumulation of waste barrels and explored the idea of onsite incineration. (TX 2444, 2448.) However, no evidence suggests that Williams was either consulted or advised of the issues.

In April 1968, Williams wrote to Eizner asking for an update on Ott II's air and water programs. (TX 458.) Yost provided a half-page response to Williams' memo on April 26, 1968. (TX 462.)

In a June 1968 memo to top-ranking Ott II officials, Williams advised Ott II officials that it was corporate policy to limit cooperation with state and federal regulators regarding waste disposal and to consult with CPC before responding to regulatory questionnaires or other inquiries. Williams stated that "as a matter of company policy in the total emissions area,

including solid waste disposal, we have operated in the spirit of cooperation, without following the strict letter of the law and without divulging self-incriminating evidence." Williams advised that any unannounced visit by regulators "should be stalled for advice from N.Y." and that "[a]ny questionnaires should be filled in promptly in pencil and forwarded to Air & Water Programs for review and decision on reply." (TX 476.)

On October 16, 1968, Ott II President James Eizner forwarded the memo to Vice President William White, with a cover memo stating that "Rick Williams wants to keep his finger on potential water and air pollution problems. Enclosed is a copy of his memo on this subject. I presume you are keeping him posted on problems, and if not, please do so." Eizner's memo was forwarded to John R. Yost, Ott II's Vice President for Manufacturing and Operations, who, in turn, inquired of R.J. Nugent whether Ott II was conforming to Williams' procedure. (TX 512.)

On November 8, 1968, Nugent responded that Ott II had not been keeping Williams up-to-date on all aspects of pollution control problems. Nugent recited numerous samplings that had been conducted by the State and stated Ott II had reported waste analyses every month. He also reported that Ott II had completed several applications in connection with tax refund and elimination requirements in which Ott II had reported information about the pollution control system, all without prior consultation with Williams. Nugent concluded, "We will make every effort to comply with Williams request and cooperate in any way we can." (TX 519.)

On January 3, 1969, John Yost provided Williams with a one-page update on Ott II environmental activities occurring since Williams' July 1968 memo, mentioning some test results and an application for a solvent burner that already had been completed by Ott, and enclosing Nugent's November 1968 memorandum. Yost told Williams that Ott II believed it was being advised adequately by its consultants Williams and Works "both as to their advice for future actions and corroborative assays." Yost further advised that "we do not anticipate difficulties because of governmental testing of effluents." (TX 531.)

Williams promptly responded, expressing his appreciation for the update and anticipating that he would continue to be copied on "communiques with respect to pollution control problems." Williams clarified that his June 6, 1968 memorandum was "a policy statement that all operations should take concurrent samples and conduct independent analysis similar to that [taken by the government agency]." (TX 535.)

In a 1969 memo to an Ott II project engineer regarding an upcoming visit by a state regulator, Williams reiterated the policy outlined in his July 1968 memo, stating: "As you know, it is our posture to be cooperative on the occasion of such inspections. We answer questions that are not self-incriminating, but we do not volunteer information, particularly about planned capital expenditures, production rates, sales volume and the like." (TX 584.)

In June 1969, when preparing a corporate report, Williams asked for and received data on capital expenditures and operating costs from the Muskegon and Charlotte, North Carolina, plants. (TX 576, 577, 596.) The evidence reflects no other contact between Ott II and Williams during 1969, despite the fact that Ott II was dealing with problems related to spills and the explosion of its incinerator, and further despite the fact that Ott II had held another meeting with the MWRC regarding discharges into the Muskegon Riv-

er and had conducted a seminar on pollution at the Muskegon facility. (TX 568, 578, 579, 600, 623, 1488, 1493, 2453.)

In addition, the record contains no correspondence or other report of activity between Williams and Ott II during 1970, despite continuing problems at Ott II with pollution from onsite drums, exceeding permit discharge limits, the installation of purge wells and other pollution problems. (TX 634, 641, 648, 649, 651, 652, 697, 2454, 2455.)

On May 28, 1971, Williams wrote a letter to Bill White at Ott II, enclosing an Army Corps of Engineers permit application for discharging wastewater into navigable waters under the 1899 Refuse Act. (TX 2483.) In June 1971, Williams provided Ott II with advice as to how to complete the permit application. (TX 760.)

Williams also was copied on other correspondence between Ott II and the Army Corps of Engineers. (TX 848, 2489, 2490, 2051, 2493.)

In September 1971, Williams wrote to David Nance at the Muskegon facility regarding a voluntary EPA survey. Williams stated that various locations under the parent umbrella had received the survey and that the corporation had not yet adopted a policy whether to complete it. The letter expressed company concern about the cost of compiling the requested information. Williams advised that while the survey sought information Ott II had collected for its Corps of Engineers applications, other subsidiaries had not previously collected the information. He agreed with Nance's plan to "put the request on the shelf," and he asked Nance to advise him of the approximate cost of compiling the Corps of Engineers information. (TX 786.)

In a subsequent memo that month to other CPC subsidiaries, Williams again noted the expense of collecting the information and advised that he was working with trade associations to eliminate or modify the request. He again advised that, in the interim, the company was holding off responding to the voluntary survey. (TX 789.)

In an October 1971 memo, Williams discussed another federal survey from the Bureau of Alcohol, Tobacco and Firearms received by certain CPC subsidiaries. The memo was not addressed to Ott II officials, though one Ott II board member (who was also a CPC executive) was sent a copy of the memo. In his memorandum, Williams noted that it was general corporate policy to cooperate with such requests. However, Williams recommended to the applicable divisions that if test results "meet acceptable levels, then the survey should be completed and forwarded by the plant manager. If they do not for any reason meet such levels, then this office should be queried with the details before the survey request is answered." (TX 799.)

On February 14, 1972, Nance wrote Williams regarding a follow-up request he had received from the EPA with respect to EPA survey. Nance asked Williams whether a corporate decision had been reached. (TX 843.)

On February 18, 1972, Williams advised Nance to go ahead and start accumulating data. (TX 2488.)

On February 29, 1972, Nance forwarded the completed survey to the EPA, apparently without preapproval by Williams, sending a copy to Williams among others. (TX 849.)

On May 5, 1972, after Ott II had responded to the EPA, Williams sent a memorandum to other CPC personnel stating that the corporation had decided to complete the voluntary survey. (TX 2492.)

From the available evidence, only one other CPC official participated in some capacity in Ott II waste disposal matters. In 1970, Hanes Heller, a CPC attorney, evaluated a stipulation with the Michigan Water Resource Commission, as well as the draft Access Rights Agreement and Service Agreement for Ott II's future use of a planned county wastewater treatment system. Heller provided detailed advice to Ott II regarding the objectives in these negotiations and the concerns raised by the draft agreements. He also indicated that if CPC was to guarantee Ott's obligations, CPC approval of the agreement was necessary. 777 F.Supp. at 561.

### 6. Financial matters

Ott II prepared monthly financial reports for CPC's Development Company, and each year the subsidiary submitted a detailed financial plan known as the "green book" for review and approval by the parent company. 777 F.Supp. at 562.

CPC sometimes functioned as Ott II's banker, advancing the subsidiary more than $5 million from 1965 to 1971. CPC also assumed a number of loans for Ott II. *Id.*

In addition, Ott II had a limit on capital expenditures that were permitted without approval from CPC's board of directors or Development Company. The ceiling on capital spending that did, not require parent approval was initially $5,000 in 1965 and became $200,000 in 1968. *Id.*

### 7. Labor matters

In 1967, CPC officials became involved in the negotiations between Ott II and a union that had previously attempted to organize at other CPC facilities. *Id.*

CPC also participated in subsequent labor negotiations in 1968 and 1970. *Id.*

### 8. Other business matters

CPC also participated in other aspects of Ott II's business. CPC provided staff services and employee benefit pro grams to Ott II; filed patents; developed, in a cooperative effort between Ott II and another CPC research facility, chemicals for use by CPC; and coordinated outside and accounting services. CPC provided these services without charge to Ott II. *Id.*

### 9. Sale of Ott II to Story

On June 9, 1972, CPC sold Ott II to Story for approximately $6.6 million in cash and a $4 million note. The transaction was made without the knowledge of the Ott II board. For six months prior to the closing, CPC operated the Ott II business for Story. Following the sale to Story, Ott II changed its name back to Four Lakes Chemical Company. *Id.*

### D. *Ownership After 1972*

In light of the fact that the liability of Story and the Cordova defendants have been resolved, and further given the court's conclusions about the liability of the CPC defendants, the court makes no renewed findings concerning ownership of the site after 1972.

## III. CONCLUSIONS OF LAW

### A. *CERCLA Overview*

Section 107(a) of CERCLA, imposes liability as follows:

> Notwithstanding any other provisions or rule of law, and subject only to the defenses set forth in subsection (b). of this section—
>
> (1) the owner and operator of a ... facility,
>
> (2) any person who at the time of a disposal of any hazardous substance owned or operated any facility at

which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable ....

42 U.S.C. § 9607(a). In this action, the parties initially invoked the first three of these liability provisions in bringing their claims. The parties stipulated that the site is a "facility" as defined by CERCLA, that it contains "hazardous substances," that "releases" of hazardous substances have occurred and threaten to continue, and that CPC, the MDEQ, and the Cordova defendants all are "persons" as defined by the statute.

### B. *Prior Decisions*

In its 1991 opinion, this court held CPC directly liable as an operator of the facility, applying a modified standard of corporate parental liability that assessed the degree of parental involvement in the affairs of the subsidiary:

Factors to consider in assessing whether a parent corporation operated its subsidiary include the parent's participation in the subsidiary's board of directors, management, day-to-day operations, and specific policy matters, including areas such as manufacturing, finances, person-

nel and waste disposal. In addition, determining the origin and business function of the subsidiary in the context of the parent corporation's business may be helpful in determining whether the parent has operated a wholly owned subsidiary. Other evidence may be less probative if it is simply indicative of the actions of a prudent investor, rather than an active operator, including monitoring of a subsidiary's financial performance, consolidation of corporate business matters such as accounting and legal work, and cooperation between the subsidiary and the parent in research.

777 F.Supp. at 573. Having concluded that CPC was directly liable as an operator, the court declined to reach CPC's indirect parental liability through the common law theory of veil piercing. Similarly, the court found it unnecessary to address the governments' arguments that CPC was liable as a successor corporation to Ott I. *See* 777 F.Supp. at 575.

On appeal of this case to the Sixth Circuit, the *en banc* court rejected the legal standard applied by this court in determining operator liability, in which the court considered the overall conduct of the parent in the course of its affiliation with the subsidiary, including the degree of control exerted by the parent over the subsidiary. *See* 113 F.3d at 581. Instead, the Sixth Circuit concluded that only two scenarios exist under which a parent corporation could be held liable for the disposal of hazardous substances at a facility whose owner of record was the parent's subsidiary corporation: (1) as an owner, by piercing the corporate veil; and (2) as an operator, where the parent directly operates the facility itself, either independently of its subsidiary or as an actual co-operator alongside the subsidiary. The court held that the facts did not support a finding that CPC directly operated the facility itself, either independently or alongside

the subsidiary. *Id.* at 581. In addition, in the course of its discussion, the court analyzed the requirements under Michigan law for piercing the corporate veil. Although the district court did not reach the question of derivative liability, the Sixth Circuit held that the facts in this case did not warrant piercing CPC's corporate veil.

The governments sought certiorari on the issue of operator liability. The Supreme Court granted certiorari. Upon review, the Supreme Court held that while this court had applied the incorrect standard for operator liability of a parent corporation, the Sixth Circuit also erred by applying an unreasonably restrictive view of circumstances that might warrant a finding of operator liability of a parent corporation. 524 U.S. at 67, 118 S.Ct. 1876.

In the course of its discussion, the Supreme Court held that the Sixth Circuit was correct in ruling that a parent corporation may be charged with derivative liability for the actions of its subsidiary only when the corporate veil may be pierced. The Court noted that significant disagreement existed amongst the courts and commentators as to whether federal or state law of veil-piercing should apply. 524 U.S. at 63–64, 118 S.Ct. 1876. The Court declined to address the issue, however, inasmuch as "none of the parties challenge[d] the Sixth Circuit's holding that CPC and Aerojet incurred no derivative liability . . . ." 524 U.S. at 64 n. 9, 118 S.Ct. 1876. Because neither party appealed the Sixth Circuit's holding on derivative liability, the Sixth Circuit's holding remains binding. *Id.*

With respect to direct operator liability, the Supreme Court rejected consideration of factors reflecting parental involvement in the subsidiary. The Court held that the relevant question is " 'not whether the parent operates the *subsidiary*, but rather whether it operates the *facility,* and that operation is evidenced by participation in the activities of the facility, not the subsidiary.' " *Id.* at 68, 118 S.Ct. 1876 (quoting Oswald, *Bifurcation of the Owner and Operator Analysis under CERCLA,* 72 WASH. U.L.Q. 223, 269 (1994) (emphasis added)). Direct operator liability does not depend on the ability to pierce the corporate veil and, therefore, does not depend on the facts relevant to derivative liability. Indeed, if a corporate parent actually acts to operate a facility, "the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability." *Id.* at 65, 118 S.Ct. 1876.

The Court thereafter defined the types of "actions sufficient to constitute parental operation." *Id.* at 66, 118 S.Ct. 1876. The Court held that

> under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66–67, 118 S.Ct. 1876.

■ The Supreme Court held that upon remand, this court was to focus its analysis on the relationship between CPC and the Muskegon facility. *Id.* at 68, 118 S.Ct. 1876. The Court rejected this court's reliance upon the interlocking directorships of CPC and Ott II, quoting with approval the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their

common ownership." *Id* at 69, 118 S.Ct. 1876 (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir.1997)). " '[C]ourts generally presume that the directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary.' " *Id.* (quoting P. BLUMBERG, LAW OF CORPORATE GROUPS: PROCEDURAL PROBLEMS IN THE LAW OF PARENT AND SUBSIDIARY CORPORATIONS § 1.02.1, p. 12 (1983)). The Court held, therefore, that in order to establish liability based on the actions of directors and officers holding dual roles with both the parent and the subsidiary, the government must show that "the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott II officers and directors, when they committed those acts." 524 U.S. at 70, 118 S.Ct. 1876. The Court admonished that

> "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

*Id.* at 72, 118 S.Ct. 1876 (quoting Oswald, 72 WASH. U.L.Q. at 282).

The Supreme Court agreed with the Sixth Circuit's determination that a parent may be held liable if it operates the facility in the stead of the subsidiary or in some sort of joint venture. The Court added, however, that a parent may also be directly liable if a

> dual officer or director ... depart[s] so far from the norms of parental influence

exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility. Yet another possibility, suggested by the facts of this case, is that an agent of the parent with no hat to wear but the parent's hat might manage or direct activities of the facility.

*Id.* at 71, 118 S.Ct. 1876. The Supreme Court noted that some evidence existed in the record that an agent of the parent alone, G.R.D. Williams, had played a role in environmental issues at the Muskegon facility. The Court therefore remanded the case for determination of operator liability under the standards articulated in *Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876.

Accordingly, applying the standard of *Bestfoods* on remand, the court must determine whether CPC may be held liable as an operator on the basis of its relationship with the Muskegon facility. In evaluating direct liability, the Supreme Court has held that this court may not rely upon the closeness of the relationship between the parent and the subsidiary. As a result, this court's findings as to CPC's representation on the Ott II board, interlocking directors and officers between the companies, general financial oversight, the extension of loans, and the establishment of general corporate policy are no longer facts tending to prove CPC's control for purposes of direct liability. Instead, to be relevant, any such dual officers or directors must have departed from the accepted norms of corporate behavior in discharging their duties. 524 U.S. at 71, 118 S.Ct. 1876.

In addition, the court must consider whether any agent of CPC actually "direct[ed] the workings of, manage[d], or conduct[ed] the affairs of the facility." 524 U.S. at 66, 118 S.Ct. 1876. Further, the court must consider whether CPC actually

operated the facility either alone or through some sort of joint venture with Ott II. Each of these questions turns on "whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary facility". *Id.* at 72, 118 S.Ct. 1876.

## C. *Liability Under CERCLA*

On remand, the United States and the State of Michigan make three arguments concerning CPC's liability under CERCLA. First, they argue, CPC is liable as an operator because Rick Williams engaged in actions directed to the Muskegon Facility that were eccentric under accepted norms of parental oversight and that Williams, as an agent of CPC alone, managed or directed operations at the facility relating to pollution. Second, they contend, CPC is liable as an operator because it actually operated chemical processing portions of the Muskegon facility with respect to the manufacture of cationic reagent and the production of a vinyl emulsion polymer. Third, the governments argue that CPC is derivatively liable as a successor to Ott I because the acquisition of Ott I constituted a *de facto* merger with CPC.

### 1. Actions of G.R.D. Williams

■ As previously recited in the findings of fact, Williams was a lawyer who coordinated air and water pollution programs for CPC. From 1966 through 1972, he drafted or was copied on numerous CPC environmental documents. Beginning in 1966, he was involved with the Muskegon facility of Ott II, upon the recommendation of dual-director Harold Hellman.

While Williams never visited the site, he consulted with Ott II officers concerning Ott II's responses to environmental agency surveys. In September 1966, he attended one meeting with the Michigan Water Resource Commission, together with Ott II officials. Prior to that meeting, Williams advised Ott II representatives not to tell the MWRC about the opinion of Ott II's engineering consultants that a biological treatment facility may be required in future. Williams generally advised Ott II to delay as much as possible the making of capital expenditures.

The record reflects, however, that, despite Williams' recommendations, Ott II officials shared with the MWRC the recommendations of their engineering consultants shortly after the September meeting. (TX 341.) The report was discussed at the November 10, 1966 meeting with the MWRC. (TX 350.) Thereafter, on November 18, 1966, the Ott II board approved $375,000 for completion of the first phases of the engineering plan and so advised the MWRC, contrary to the recommendation of Williams, who sought to delay all expenditures until 1968. (TX 355). Since none of Ott II's engineers recommended biological treatment or additional incinerators or deep well in 1966 (TX 341, 342), Ott's decision not to seek or approve funds for such treatment in 1966 cannot be viewed as being caused by Williams' advice.

Taken together, the record reflects that while Williams may have advocated that Ott II delay implementation of waste treatment plans, his advice was rejected. Although delays in discharge compliance eventually occurred, and although the biological treatment facility was never built, those delays are not shown to have resulted from any influence Williams may have had on Ott II at the September 1966 meeting. Instead, they reflect the Ott II decision to connect to the county waste water treatment system, and the record contains no evidence that Williams was involved in that decision.

In sum, the record evidence is far too thin to conclude that Williams was responsible for any delays in compliance.[5] Rather than demonstrating control by Williams on behalf of CPC, the evidence is consistent with articulation of overall corporate policy and procedures, which "should not give rise to direct liability." *Bestfoods,* 524 U.S. at 72, 118 S.Ct. 1876. Williams' limited involvement with the MWRC in 1966 is not consistent with control of Ott II.

The governments next suggest that Williams' control is demonstrated by various memoranda and letters sent by him or to him with respect to pollution issues. Specifically, the governments point to Williams' memoranda outlining corporate policy about how divisions and subsidiaries should respond to governmental agency surveys and plant visits. In those memos, Williams stated that plant facilities should advise and consult with his office prior to any anticipated agency visits, or stall for time to consult when such visits were not anticipated. He also stressed that it was company policy to reply to requests for information when responses were not incriminating. He urged subsidiaries to complete any surveys in pencil for review by his office prior to mailing.

The record reflects, however, that Ott II generally did not comply with such requests. Instead, Ott II officials typically supplied Williams with information about completed surveys, applications and site visits well after the event, and then only when reminded to do so. Ott II's Vice President Yost also notified Williams that Ott II believed it was receiving adequate advice from its own engineering consultants.

Further, while Williams may have wanted copies of all correspondence concerning environmental issues, the record contains dozens of pieces of correspondence between Ott II and the MWRC, even after Williams' June 6, 1968 memo, that were not addressed or copied to Williams. These communications involved a wide range of compliance issues at the facility, including an explosion at the Ott II incinerator, spills of hazardous materials, and operation of onsite purge wells.

Similarly, contrary to the governments' representations, nothing in the record shows that Williams had authority to require anything. Yost at no time testified that he was "required" to keep Williams informed. Instead, Yost testified that he was asked to keep Williams informed. Indeed, no witness testified to Williams' authority, though numerous witnesses specifically denied that he possessed that authority. Once again, rather than demonstrating control by Williams, the correspondence and testimony more accurately represents the expression of overall policies and procedures that do not confer direct liability. *See* 524 U.S. at 72, 118 S.Ct. 1876 (articulation of general policies and procedures does not give rise to direct operator liability). Moreover, Williams' desire to "keep his finger on environmental problems" at Ott II is fully consistent with CPC's parental oversight role. (TX 512.)

The governments contend, however, that Williams' actions in this case are similar to the actions reviewed and found to be sufficient under the *Bestfoods* standard in

---

5. The governments argue that "Williams himself acknowledged that he had slowed environmental compliance at the Muskegon Facility and saved CPC at least $50,000 through those stalling efforts". Pl. Resp. Br. (dkt # 811) at 4. Williams's statement was made in an internal report to his superiors summarizing the importance of his activities. In context, the statements are more accurately interpreted as self-aggrandizement. They may not serve as affirmative evidence in the face of a contradictory record.

*United States v. Kayser–Roth Corp.,* 103 F.Supp.2d 74 (D.R.I.2000). In *Kayser–Roth,* the district court was asked to relieve Kayser–Roth from final judgment under FED. R. CIV. P. 60(b)(5) on the grounds that the prior decision had prospective application and that the *Bestfoods* decision amounted to a material change in the law. The court concluded that Kayser–Roth had failed to meet its burden of showing that the granting of relief under Rule 60(b)(5) and vacating the judgment would "not be an empty exercise." *Id.* at 81 (quotation omitted). The court held that the prior decision by the district court, which had been based on the now-obsolete "pervasive control" test, should not be vacated. The court held that ample facts demonstrated Kayser–Roth's actual control over Stamina Mills, its subsidiary, in determining how the contaminating agent was used and handled. The court found that Kayser–Roth actually controlled the settlement of a water discharge claim against Stamina Mills.

Here, in contrast, no evidence demonstrates the type of parental control over Ott II's production and disposal of waste. Williams did not have control over the Muskegon facility's production or disposal of waste.[6]

Similarly, the governments have failed to present sufficient evidence that any other CPC officer or dual officer/director may have engaged in activities sufficiently "eccentric," *id.* at 72, 118 S.Ct. 1876, as to impose operator liability. The limited role of Hanes Heller in providing legal advice concerning Ott II's connection to the county waste water treatment system clearly is inadequate to establish liability. The court is aware of no case in which legal advice provided by a parent corporation's attor-

ney to a subsidiary represents control of the subsidiary. *See* 777 F.Supp. at 573 (noting that "consolidation of corporate business matters such as accounting and legal work" are not terribly probative of actual operation); *Schiavone v. Pearce,* 77 F.Supp.2d 284, 290 (D.Conn.1999) (rejecting operator liability based, in part, on participation of parent corporation's attorney in contract negotiations arranging sale of subsidiary assets to third party); *Datron, Inc. v. CRA Holdings, Inc.,* 42 F.Supp.2d 736, 747 (W.D.Mich.1999) (granting summary judgment, holding in part that operator liability not established by involvement of corporate counsel for parent in advising on legal question and assisting in negotiations for settlement).

Finally, the governments have not attempted to argue that sufficient record evidence exists to conclude that dual officers/directors served the interests of the parent, CPC, while "ostensibly acting on behalf of the subsidiary in operating the facility." *Bestfoods,* 524 U.S. at 71, 118 S.Ct. 1876. No evidence has been proffered that "despite the general presumption to the contrary, the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott II officers and directors, when they committed those acts." *Id.* at 70, 118 S.Ct. 1876. Instead, the most that may be said is that CPC and Ott II had interlocking boards, with dual officers and directors making policy decisions and supervising activities at the facility, a circumstance the Supreme Court has rejected as proof of operator control. *Id.*

## 2. CPC Operation of Portions of the Muskegon Facility

■ The governments next argue that sufficient record evidence exists to hold

---

**6.** In addition, the decision on operator liability in *Kayser–Roth* is only an alternative holding. The court also reaffirmed as law of the

case the district court's original holding that Kayser–Roth is liable as an owner through the doctrine of piercing the corporate veil.

CPC liable as an operator for its actual use of portions of the Muskegon facility. In response, CPC argues that this court has no authority to review CPC's alleged operation of the facility in some sort of joint venture. In the Sixth Circuit's *en banc* decision, the court held that while a parent may be held liable "as an operator, where the parent directly operates the facility itself, either independently of its subsidiary, or as an actual co-operator alongside the subsidiary, ... this theory ... is not supported by the facts in the record before us." 113 F.3d at 581. CPC contends that the finding represents the law of the case and that, in the absence of new record evidence not introduced here, that finding is conclusive.

■ As CPC notes, "a fundamental precept of common-law adjudication is that an issue once determined by a competent court is conclusive." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). However, in the instant case, the governments specifically appealed the Sixth Circuit's rulings on operator liability and the Supreme Court vacated the Sixth Circuit decision and clarified the analysis of operator liability. The Court remanded for new findings, specifically noting that the governments were free to point this court to such additional facts not cited in the prior opinion as may support a finding of liability. *Bestfoods*, 524 U.S. at 73 & n. 14, 118 S.Ct. 1876. This court made no findings in 1991 with respect to any possible joint venture. As a result, the Sixth Circuit's holding is no longer the law of the case and does not bind this court.

■ In response to the Supreme Court's invitation, the governments have pointed to a number of facts contained in the record but not previously recited in the 1991 decision regarding occurrences at the Muskegon facility that they argue amount to actual operation of the facility by CPC on its own or in a joint venture with Ott II. First, the governments note that beginning in 1966, Ott II began to develop and later manufacture cationic reagent for CPC to meet CPC's needs, under CPC's manufacturing instructions. (TX 1385, Uncontroverted Facts 63, 64.) Ott II sold cationic reagent to CPC at market prices. (TX 63.) The manufacture of cationic reagent required Ott II to expand its production capacity at the Muskegon facility. Between 1965 and 1971, CPC advanced over $5.5 million to Ott II, which was used in part to expand production. (Uncontroverted Facts 53.) As a result, they argue, CPC may be said to have operated or jointly operated the Muskegon facility.

Admittedly, the record reflects that all parties wanted to rapidly expand Ott II's capacities and business. (TX 171.) However, the fact that the parties perceived the manufacture by Ott II of a product in use by CPC as a "good fit" does not support a conclusion that the interests of Ott II were subserved to CPC in the production or that CPC operated the facility itself. (TX 1385.) Similarly, CPC's desire to purchase the product from its wholly owned subsidiary rather than a third party does not support a conclusion that CPC actually operated the facility to produce the product. *See United States v. Iron Mountain Mines, Inc.*, 987 F.Supp. 1277, 1284 n. 14 (E.D.Cal.1997) ("Purchasing a product and encouraging its production are not the same as controlling the cause of the contamination or managing the mine."). Further, the supplying of capital by a parent to a subsidiary is "typical of a parent corporation's investment in a new subsidiary." *Schiavone*, 77 F.Supp.2d at 292 (applying *Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876).

■ The governments next argue that CPC also actually developed and produced

methyl glucoside polyether and a vinyl emulsion polymer at the Muskegon facility in the Pilot Plant and Building No. 603. From the record it unquestionably appears that the production of polyether was first developed at CPC's Moffett Technical Center and that Moffett explored with Ott II whether Ott II could manufacture the product in production quantities in accordance with Moffett specifications. (TX 441.) Ott II made some changes to its equipment with advice from Moffett, in order to attempt manufacture of the product. These facts clearly demonstrate that Ott II was attempting to manufacture a product for CPC. However, they do not suggest that such manufacture was for CPC's—not Ott's—benefit or that CPC had the kind of control necessary to be considered an operator under the *Bestfoods* standard. 524 U.S. at 71, 118 S.Ct. 1876 (reiterating that "operation" requires "the exercise of direction over the facility's activities").

■ The governments also argue that alterations were made to the Muskegon plant in order to produce PVAc paper coating, reflecting control of the facility by CPC. The record reflects that Ott II indeed attempted to manufacture PVAc paper coating in production quantities based on a product developed at the Moffett Technical Center. (TX 501.) In a memo dated September 5, 1968, Moffett officials noted that any further manufacturing runs had to be planned after consultation with Ott II's schedule. (TX 501.) The language of the memo suggests that Moffett officials came onsite to the Muskegon facility and consulted on the production process. However, the fact that Ott II was required to be consulted about their future availability reinforces the conclusion that Moffett (CPC) had no control of the facility and that Ott II retained that control. Such an interpretation of the memoran-dum is consistent with a conclusion that Ott II was engaged in development of a custom manufacturing relationship, not a joint venture or actual operation by CPC.

An August 20, 1969 report demonstrates that Ott II engaged in a trial test of another paper coating polymer for CPC, but that there were problems with that process as well. (TX 590.) Again, the same report reflects that Ott II had other commitments that precluded further work on the CPC process in the near future, evidencing Ott's continued control of its facility.

■ Ott II also explored manufacture of synthetic leather, a product being developed by CPC. (Cregg dep. 20, Cregg TT 389–91.) At least one CPC chemist or engineer, "Mr. Wolf," came to Muskegon from Argo, Illinois, to advise Ott II employees how to conduct the manufacturing procedures, such as pressure and temperature settings. (Cregg dep. 11, 41–44.) Ott II employee, Jon Cregg, characterized Wolf as "directing" the manufacturing run in the Pilot Plant, though Ott II employees still operated the systems. (Cregg dep. 41–44.) Cregg acknowledged, however, that Ott II officials necessarily would have provided the authorization for the run. (Cregg dep. 43–44.) Moreover, Ott II officials expressly denied that anyone outside of Ott II had the authority to direct manufacturing at Ott II. (TT 1159; Nugent dep. at 28.)

While Cregg's testimony provides limited evidence of CPC's involvement with the Muskegon facility in an effort to develop a product Ott II could manufacture, I conclude that Cregg's statement that Wolf "directed" the manufacturing process is insufficient evidence from which to conclude that CPC had the necessary control to be considered to have "operated" the facility under the standard set forth in *Bestfoods*. Ott II employees actually op-

erated the manufacturing process and Ott II managers authorized the run. Wolf's role is more akin to that of a consultant providing information on a particular process than someone with authority to control the Ott II facility. *See United States v. Township of Brighton,* 153 F.3d 307, 314 (6th Cir.1998) (holding that *Bestfoods* requires "actual control" of site and affirmative acts to confer operator liability).

The governments, however, cite *Browning–Ferris Ind. v. Ter Maat,* 195 F.3d 953 (7th Cir.1999). Applying *Bestfoods,* the *Ter Maat* court held that an individual may be liable under CERCLA if he operates a facility personally, rather than merely directing the business of the corporation. *Id.* at 956. The governments argue that *Ter Maat* supports the conclusion that, since CPC agents were on site at the Muskegon facility and actually operated the Pilot Plant and other chemical processing facilities, it is an operator under CERCLA.

The facts in *Ter Maat* are not closely analogous to the instant case. In *Ter Maat,* Richard Ter Maat was the principal shareholder and president of two corporations involved in the ownership and operation of a landfill. Another responsible party under .CERCLA sought to hold Ter Maat liable individually for actions he took while serving as an officer and director. Applying the reasoning of *Bestfoods,* the Seventh Circuit held that in his role as president of the corporation (rather than shareholder), Ter Maat could be found liable as an operator for certain kinds of actions he personally took. It remanded the case for factfinding.

The holding in *Ter Maat* does no more than extend the reasoning of *Bestfoods* to reach an individual shareholder. As applied to the instant case and the liability of a parent corporation, *Ter Maat* provides no additional guidance beyond that set forth in *Bestfoods.* As the court has determined, the evidence available concerning CPC's actions in helping Ott II to develop new products is not sufficient to demonstrate that CPC actually operated the Muskegon facility.

Similarly, the court concludes that *Bestfoods* does not authorize this court to find the existence of some sort of joint venture between CPC and Ott II in the absence of more evidence of an actual agreement. *See BP Amoco Chem. Co. v. Sun Oil Co., FMC,* No. 00–082–RRM, 2001 WL 1134966 (D.Del. Sept.17, 2001) (concluding that if a loose reading of joint venture were adopted, the exception would eviscerate the presumed separation between parent and subsidiary and would render useless the usual need to pierce the corporate veil to establish parental liability). The court is persuaded that while the governments' evidence demonstrates certain cooperation by Ott II with CPC to increase Ott II's product line, the evidence is insufficient to demonstrate a joint venture pursuant to *Bestfoods.* Such cooperation simply does not establish the requisite ability to "manage, direct or conduct operations specifically related to pollution ...." *Bestfoods,* 524 U.S. at 51, 118 S.Ct. 1876.

█ Finally, the governments note that in 1971 CPC and Ott II jointly began to produce NNDMA, which they argue demonstrates control and actual operation of the facility by CPC (TX 749, TX 771, TX 828, Uncontroverted Facts 64.) Again, I disagree. As in the previously cited circumstances, Ott II manufactured a product for CPC that originally was developed at the Moffett Technical Center. However, Ott II clearly was the manufacturing corporation. While the product was manufactured for CPC's use or distribution, the record is insufficient to demonstrate the requisite control or direction of the Muskegon facility by CPC. *See Bestfoods,* 524

U.S. at 71, 118 S.Ct. 1876 (defining "operation" as including "the exercise of direction over the facility's activities"). Indeed, during product development, Ott II treated itself as a supplier, providing a cost estimate to CPC reflecting its raw materials and waste disposal costs for production of a specific quantity of NNDMA. (TX 771.) After production began, Ott II notified CPC of the current price per pound for NNDMA sales, FOB Muskegon. (TX 828.) Ott II also notified CPC how future billing of the product would be conducted. These facts demonstrate that Ott II was producing a specific product for CPC according to CPC's specifications, but that it controlled the production and billing for its services. *See United States v. Vertac Chem. Corp.*, 46 F.3d 803, 809 (8th Cir. 1995) (concluding that United States did not have sufficient control to be held liable as an operator, relying in part on facility's control of whether and at what price to produce product).

Reviewing the asserted conduct both separately and together, I am satisfied that CPC's involvement with Ott II's product development does not demonstrate the requisite control over the facility to render CPC liable as an operator of the facility.

### C. *Successor Liability*

■ The governments next argue that CPC is liable as the successor corporation to Ott I. CPC asserts that the government is barred from raising the issue of successor liability in this proceeding.

In 1991, over CPC's objection, the court permitted testimony on the issue of Ott II's liability as a successor to Ott I. The court, however, ultimately declined to reach the question in light of its determination that CPC was directly liable as an "operator" under CERCLA. 777 F.Supp. at 575.

CPC now objects to the government's theory of successor liability, arguing that it has never had proper notice of the governments' present claim that CPC is liable as a successor corporation to Ott I. Before trial in 1991, CPC moved in limine to exclude evidence of Ott II's liability as a successor to Ott I on the grounds that CPC had been given no notice of the theory. The court permitted the governments to proceed to trial on the issue whether Ott II was the corporate successor to Ott I. In their post-trial briefing, the governments submitted certain proposed findings of fact and conclusions of law to the effect that CPC, not Ott II, was liable as a corporate successor to Ott I. *See* 777 F.Supp. at 576 n. 10. CPC, moved to strike those proposed findings and conclusions, arguing that it had no notice of this alternative theory. In its opinion, the court denied CPC's motion without prejudice on the grounds of mootness, but the court implicitly acknowledged the existence of a genuine issue concerning CPC's notice of the theory. *Id.* As a result, to the extent CPC's successor liability remains an issue on remand, CPC unquestionably has preserved an objection to the theory and to the adequacy of notice for purposes of discovery.

■ Moreover, CPC's complaint about the adequacy of notice brings to the forefront CPC's second objection to the government's successor liability theory. As CPC observes, following the Supreme Court's decision in *Bestfoods*, this court directed the parties to submit status briefs on the issues remaining before this court after remand. At that time, neither the United States nor the MDEQ identified successor liability as an issue remaining to be resolved. The governments now assert that they interpreted the court's order as a request to identify those issues needing to

be decided on remand that arose from the *Bestfoods* decision.

The governments' argument is unpersuasive. In its July 20, 1998 order setting status conference, this court ordered:

> that in light of the recent Supreme Court decision, each party shall, no later than August 10, 1998, file with this court a brief setting forth what it perceives to be the issues remaining for this court to decide, what further proceedings may be necessary, and a suggested time schedule.

Order Setting Status Conference, Dkt # 709. The order in no way suggests that the court was inquiring about only those issues arising out of the remanded question. In fact, the governments apparently did not perceive the order to be so limited; they clearly identified cost and penalty issues that may need to be decided after the liability phase. As a consequence, while the governments now contend that they interpreted the order as being limited to those issues arising from the *Bestfoods* decision, at least some unrelated issues were set forth in their briefs. However, neither the MDEQ nor the United States identified successor liability as an issue remaining in the case. (Dkt ## 717, 718.)

Moreover, both CPC and the Cordova defendants included *all* defensive issues previously raised and not decided. Indeed, this court's August 24, 1998 order setting deadlines for the proceedings on remand (dkt # 725) identified three issues raised by CPC and the Cordova defendants that were distinct from the remanded issues. The court also demonstrated its willingness to amend the statement of pending issues in an addendum to the order (dkt # 728) issued September 3, 1998. Yet at no time during the supplemental discovery period or in the two years preceding the filing of their proposed findings of fact did the governments supplement their position or provide notice to the court or CPC that it intended to renew its successor liability argument.

The Sixth Circuit repeatedly has held that the failure to disclose "a theory of recovery in a pretrial statement constitutes a waiver of that theory." *Gregory v. Shelby County Tenn.,* 220 F.3d 433, 442 (6th Cir.2000); *Olsen v. American S.S. Co.,* 176 F.3d 891, 897 (6th Cir.1999); *McKinney v. Galvin,* 701 F.2d 584, 586 n. 3 (6th Cir.1983). Similarly, courts have held that one of the reasons for holding a status conference is to "expedite disposition of cases by simplifying the issues and eliminating surprise." *Smith v. Gulf Oil Co.,* 995 F.2d 638, 642 (6th Cir.1993). In the instant case, the status conference held August 17, 1998 was particularly directed to clarifying the remaining issues before the court. The court also asked the parties to address whether any remaining issues required expansion of the record. The failure to advise the court and opposing parties of the continuing pursuit of a previously raised issue prevented CPC from seeking to supplement discovery on the issue of its successor liability.

The governments argue, however, that the Supreme Court has defined "waiver" as "an intentional or relinquishment or abandonment of a right." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). They contend that they did not knowingly relinquish their theory of relief and therefore may not be considered to have waived it. *Johnson,* however, addressed the nature of a waiver in the context of the abandonment of a criminal defendant's right to an attorney. *Id.* The waiver of a constitutional trial right is simply not comparable to the waiver of a civil theory of liability. The question of intent is irrelevant to consideration of the consequences of a represented par-

ty's failure to raise a theory of relief when directed to do so by the court.

Accordingly, under the circumstances of this case, I am persuaded that the governments have waived their successor liability claim.

■ Moreover, even were the court to consider the issue of successor liability not to have been waived, the theory would not avail the governments. The court will assume for purposes of this discussion that Ott II could be considered the successor corporation to Ott I by virtue of a *de facto* merger. However, the court is aware of no case holding that a parent corporation may be held liable solely on the basis of a *de facto* merger of a subsidiary with the predecessor corporation.

■ The Sixth Circuit recognizes that Congress intended to include successor corporations among the classes of potentially liable parties under CERCLA. *Anspec Co., Inc. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1245 (6th Cir.1991). Also, in this circuit, state law provides the standard for determining the liability of successor corporations under CERCLA. *Id.* at 1248. Under Michigan law, the general rule is that a corporation that purchases the assets of another corporation does not, without more, assume the debts and liabilities of the selling corporation. *Stevens v. McLouth Steel Prod. Corp.,* 433 Mich. 365, 370–71, 446 N.W.2d 95 (1989). The general rule, however, is subject to five exceptions:

(1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the

elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; and (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Foster v. Cone–Blanchard Machine Co.,* 460 Mich. 696, 702, 597 N.W.2d 506 (1999). The governments assert that CPC is liable because the acquisition of Ott I constitutes a *de facto* merger. *See Anspec,* 922 F.2d at 1246.

■ Under Michigan law, in order to prove the existence of a *de facto* merger, plaintiffs must demonstrate:

(1) there is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; (3) the seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible; and (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 420, 244 N.W.2d 873 (1976) (citing *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 801 (W.D.Mich.1974)).[7] All

---

**7.** The *Turner* court ruled on the liability of a successor corporation under the "continuity of enterprise" theory, not the *de facto* merger theory, because the transaction in *Turner* in-

volved an acquisition of assets in exchange for cash, as opposed to an exchange for stock. Nevertheless, the Michigan Supreme Court

four factors must be present to find a *de facto* merger under Michigan law. *See Chrysler Corp. v. Ford Motor Co.*, 972 F.Supp. 1097, 1111 n. 11 (E.D.Mich.1997).[8]

 Applying the elements of *de facto* merger to the transaction between Ott I and CPC leading to the formation of Ott II, I conclude that the governments have failed to demonstrate a *de facto* merger between Ott I and CPC on the basis of both the first and fourth elements. As the court has noted, while Ott II substantially continued the enterprise of Ott I, including management, name and operations, CPC did not do so. CPC remained distinct in its management, name and type of operations. While CPC purchased and paid for the assets with its own stock, it did so by establishing a subsidiary corporation, a clearly lawful and permissible structure for limiting corporate liability. As the Supreme Court has emphasized, a wholly owned subsidiary is presumed to be independent for liability purposes. *See Bestfoods*, 524 U.S. at 61–62, 118 S.Ct. 1876. The mere fact that CPC purchased Ott I's assets in exchange for its own stock is insufficient, standing alone, to confer liability. *See Chrysler Corp.*, 972 F.Supp. at 1111.

In addition, the fourth element is not met. After the transaction, CPC did not assume the liabilities and obligations of Ott I necessary to continuation of Ott I's normal business operations. Although the initial agreement between CPC and Ott I spoke of CPC as the obligor on various obligations (TX 132), the parties amended that agreement (TX 133). In the amended agreement, the parties agreed that CPC would incorporate a subsidiary corporation, which would succeed to CPC's rights and privileges, as well as CPC's obligations and undertakings, under the original agreement. The amended agreement specifically released CPC from the obligations and undertakings under the original agreement. (TX 133.)

The governments cite no case in which a parent company has been held liable as a successor to a company whose assets have been obtained by a stock transfer and then held and operated by a subsidiary of the parent. The governments argue, however, that this case is factually indistinguishable from *Shannon*, 379 F.Supp. 797, in which the court held the successor corporation liable on a product liability claim. I disagree.

The circumstances in *Shannon*, while similar in some respects, are distinct from

---

expressly adopted the standard for *de facto* merger set forth in *Shannon*.

**8.** CPC argues that the court should hold that *City Management Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244 (6th Cir.1994), bars application of the *de facto* merger theory to CERCLA cases. *City Management*, however, expressly addressed the *Turner* court's expansion of the mere continuation theory to product liability cases in which assets have been transferred in a cash, rather than a stock, transaction. The *City Management* court declined to extend the *Turner* version of the "mere continuation" exception to CERCLA cases.

*City Management* is inapplicable for several reasons. First, the governments do not argue that the court should apply the "mere contin-

uation" exception, much less the expanded version addressed in *Turner*, 397 Mich. 406, 244 N.W.2d 873. Instead, the court is asked to apply the *de facto* merger theory. Second, the transaction in the instant case involved an exchange of shares, not cash. Third, the Sixth Circuit has recognized that a formal merger results in successor liability under CERCLA, and it has approved a Ninth Circuit decision approving successor liability under CERCLA by way of a *de facto* merger. *See Anspec*, 922 F.2d at 1245. The requested extension of *City Management* to the theory of *de facto* merger would conflict with the reasoning of *Anspec*. As a result, I conclude that *City Management* is inapplicable on the facts of this case.

this case in a pivotal way. In *Shannon*, as here, the assets of the Samuel Langston Company were purchased by the Harris Intertype Corporation with an exchange of Harris stock. Harris formed a new corporation known as The Langston Company. In accordance with the purchase agreement, the old Samuel Langston Company changed its name to the SML Corporation and the Langston Company took over the manufacturing operations. The SML Corporation then voluntarily dissolved, distributing the Harris stock to its shareholders for the purpose of liquidation. Thus far, the facts are similar to this case.

However, as the *Shannon* court specifically noted, the facts of that case showed that the Langston Company was statutorily merged with Harris Intertype two years after the *de facto* merger transaction between the Samuel Langston Company and the Langston Company. Following the statutory merger, the Langston Company became the Langston Division of Harris Intertype Corporation. After reciting the circumstances of the statutory merger, the court observed that "[i]f The Langston Company or the Langston Division is liable, Harris Intertype is liable as a matter of law." *Id.* at 799. In other words, Harris Intertype became liable by way of the statutory merger between Harris Intertype and the Langston Company, not by way of the initial *de facto* merger between the Samuel Langston Company and the Langston Company.

Here, in contrast, CPC never formally merged with its wholly owned subsidiary Ott II. This distinction is critical. Although the court will accept without deciding that Ott II may be considered a successor corporation to Ott I, that analysis may not itself render CPC a successor corporation. Instead, CPC's liability must

turn on some legal theory whereby it, like Harris Intertype, may be bound by the actions of its subsidiary. Harris Intertype legally became the successor to The Langston Company by formal merger. Absent the formal merger found in *Shannon*, parental liability must be established by other means, such as corporate veil-piercing. In the instant case, it is undisputed that the veil-piercing theory has been fully litigated and finally decided by the Sixth Circuit and is not applicable here.

Accordingly, the *Shannon* case is fully distinguishable. Moreover, the *Shannon* decision itself specifically recognizes a necessary legal basis (statutory merger) for holding the parent company liable if the subsidiary may be deemed to be a successor corporation. No such connection is made in the instant case.

As a consequence, while the subsidiary (Ott II) may be considered a successor corporation to Ott I, the governments have failed to prove a basis under Michigan law for finding the parent corporation—CPC— a successor to Ott I. Accordingly, in addition to waiver, the governments' theory of successor corporation fails for the reason that CPC's acquisition of Ott I did not constitute a *de facto* merger of the two corporations.

## IV. CONCLUSION

In sum, the governments have failed to prove that CPC is liable under CERCLA for environmental cleanup costs at the Muskegon site, either directly as an operator, or derivatively as a successor corporation to Ott I.[9] Accordingly, CPC is entitled to judgment in its favor as to all pending claims, cross-claims and counter-claims against it.

---

9. In light of the court's disposition of the statutory questions, the court need not and does not reach CPC's constitutional challenge.

## JUDGMENT

In accordance with the opinion filed this date,

**IT IS ORDERED AND ADJUDGED** that judgment is hereby entered in favor of CPC International Corporation as to all pending claims, cross-claims and counter-claims in these consolidated actions, and against the United States of America, and the Michigan Department of Natural Resources (now the Michigan Department of Environmental Quality) as to those pending claims, cross-claims and counter-claims.

These consolidated cases, including all pending cross-claims and counter-claims are hereby dismissed with prejudice.

**IT IS SO ORDERED.**